S. W. Korf et al., Plaintiffs-Appellees, v. Joseph B. Fleming
et al., Trustees, Defendants-Appellants.

No. 47159.

(Reported in 32 N. W. 2d 85)

APRIL 6, 1948.

Richard A. Stewart, of Washington, and R. L. Read and A. B. Howland, both of Des Moines, for appellants.

Carlton C. Wilson and Alfred E. Baldrige, both of Washington, for appellees.

BLISS, J.—Plaintiff S. W. Korf is the owner of the 140-acre farm in Washington County, Iowa, across which the defendants, in the exercise of the right of eminent domain, condemned a right of way and constructed a track thereon for the relocated line of their railway. Plaintiff Charles Cannon had been a tenant of the farm during the years 1944 and

1945, and was the tenant during the 1946-1947 farm year under a lease providing for a cash rental of $10 an acre, or $1,400 for the year.

On June 26, 1946, under statutory proceedings, commissioners appointed by the sheriff of the county to assess and appraise the damages incident to the condemnation, fixed the amount therefor to be paid to Korf, as the owner of the farm, at $7,750, and the amount to be paid to Cannon, as the tenant, at $1,200. Defendants appealed from these awards to the district court, and upon trial in said court, statutory record of the awards to owner and tenant was entered in the respective sums of $8,750 and $1,350. On said appeal the owner claimed damages in the sum of $15,400, and the tenant in the sum of $1,950. Defendants do not assign error on this appeal because of the court's order fixing the amount of fees for plaintiffs' attorneys at $1,175.

The farm is about six miles from the city of Washington, the county seat, and is about three miles from the town of Ainsworth. It is in a consolidated school district. A rural mail route, electric power line, and school-bus route, are along an all-weather gravel highway just south of and abutting the farm. The farm consists of three 40-acre tracts in a north-south row: the E½ of the NE¼ of Section 30, the SE¼ of the SE¼ of Section 19, and the north 20 acres of the SW¼ of the SW¼ of Section 20. The tract last described abuts the east side of the north forty.

The right of way, 200 feet wide, with an area of 6.69 acres, crosses the south forty diagonally southwest-northeast. The south line of the right of way at the east line of the forty is about 1,041 feet north of the south line of the forty, and at the west line of the forty it is a little more than 200 feet north of said south line. Approximately thirteen acres lie south of the right of way, and the remainder of the farm lies north of it. The buildings—house, barn, double corncrib, single corncrib, granary, hoghouse, chicken and brooder houses, well, tank and windmill—are all south of the right of way and separated by it from the rest of the farm. They are adequate and in quite good repair and are situated about midway east and west near the south line of the south forty.

The railroad cut, extending the length of the right of way, is about 15 feet deep at its east end, and about six feet at the west end, and about 11 feet deep midway between the ends, where the lane crosses the right of way. Before the cut was made a fenced lane extended from the barn lot north about the center line of the south forty and over 200 feet into the middle forty, and from that point an unfenced farm road extended northeasterly up into the north forty to a tract of about ten acres of tillable ground along the north side thereof. This lane and road afforded ready access to all parts of the farm north of the buildings, and permitted the livestock to go at will to and from the pasture and fields and the shelter, feed and water of the barn lot. The defendants constructed a planked crossing where the lane intersects the right of way. To reduce the grade on each side of the crossing to not exceed eight per cent, the defendants excavated beyond the right of way lines on each side so that the gates in the lane on each side of the crossing are 366 feet apart. The farm buildings are about 300 feet from the track. West from the lane crossing, the track is level and straight, and on a clear day a person standing on the natural ground surface on either side of the crossing can see a train approximately a mile to the west, and to the east about 3,100 feet, where the track curves to the north. Over this track three regularly scheduled passenger trains and three freight trains will pass westward each day, and the same number and type of trains will pass eastward daily. They will be either Diesel or steam propelled. Operating rules of defendants permit Rocket-type Diesel-powered passenger trains to travel at a maximum speed, on an approximately straight track, of 90 m.p.h.; steam-powered passenger trains at 70 m.p.h.; and freight trains at 50 m.p.h. There will also be extra freight trains.

The right of way crosses the very best land in the farm. The south forty is level and thoroughly tiled. The soil is a very productive Grundy silt loam. In 1946 the corn on that forty averaged 100 bushels an acre. Three and one-half acres of corn growing on the right of way west of the lane were destroyed by the railroad construction. East of the lane on

the right of way the tenant secured the first cutting of clover but lost the remainder, except a little hay which he was able to cut on the right of way.

The middle forty has a lighter and less productive soil than that of the south forty. It is also more readily subject to erosion. In 1946 the west half of this forty—19.5 acres—was in oats. The yield was light—about 500 bushels. The east half of the middle forty has a clover meadow of a few acres along its south line, and just north of the east part of this meadow in 1946 there were 3.2 acres of corn, which yielded between 65 and 70 bushels per acre. Extending northward through the north three fourths of the east half of the middle forty and into the north forty to Long Creek is an eroded ditch. At its greatest width it is perhaps 60 feet, and its greatest depth is from 10 to 15 feet. Several sodded swales drain into it. On each side of the ditch is permanent bluegrass pasture of 14.4 acreage. The tenant testified that he lost the use of this pasture in 1946. Just why he did is not clear as it was completely fenced at all times.

In 1946 there were 9.2 acres of corn along the north border of the north forty. The remainder of that forty, about 31 acres, is creek bottom and rough timber pasture. At the south line is a small barn into which 15 head of cattle might crowd for shelter, but which could properly accommodate only about six head. Long Creek crosses this forty east and west about midway and on eastward across the south side of the 20 acres in the SW¼ of the SW¼ of Section 20. In the latter 20 acres north of the creek, there were 16 acres of corn in 1946. The tillable ground in these 20 acres and in the north ten acres of the north forty is of good soil—not so good as the south forty—and productive, but has some overflow water from the north and from the creek. The corn in these two fields averaged 60 bushels per acre in 1946. The four acres south of the creek, in the 20 acres in Section 20, were of very little value to the farm and of no value to the tenant in 1946. It is wet, brushy, creek bottom and is fenced out of the farm and into the land on the Montgomery farm.

The farm as a whole is just an average farm. Approximately one third of it is permanent pasture of mediocre grade. The

farm had been operated as a combination stock and grain farm. There was evidence that it would raise sufficient feed for about 30 head of cattle, old and young and perhaps 90 hogs. In 1946 the tenant had five milk cows, and at the time of the trial in January 1947 he had five brood sows.

The petition of the plaintiff contained two counts—one for the owner and the other for the tenant. Damages were claimed for the loss of the ground appropriated; the damage to the land remaining; the loss of the crops thereon; for the division of the farm and the consequent damage and inconvenience in its operation because thereof; the dangers incident to the use of the lane crossing by the occupants of the farm in the taking of the farm machinery, crops and livestock over it; the interference with the movements of livestock between the pasture and fields and the barn and feed lots and water tank; the additional fencing to mow; the smoke, soot, dust, noise, and fire hazards incident to fast moving trains; the reduction in the sale and rental value of the farm; the increased expense and labor in operating the farm.

The defendants conceded that the farm would be damaged, but alleged the extent thereof would not exceed $5,000 to both the owner and the tenant, and that any damage awarded should be apportioned between them. In their answer they specifically denied the various elements of damage alleged in the petition.

The defendants cut the line fences of the condemned land about July 12, 1946. Grading work commenced on August 21, 1946. The first work consisted in the removal of about 18 inches of surface soil. The machines worked from east to west. About three weeks later an elevating grader was put in, and removed three feet of dirt the length of the right of way. This work was done in the week ending September 21, 1946. Defendants started the construction of the right-of-way fences in August and completed them early in December 1946. The track was laid but not fully ballasted at the time of the trial. Much of the dirt had not been leveled at that time.

Defendants assign twelve errors. A number of these complain of improper limitation of the cross-examination of some

of plaintiffs' witnesses on values. We will first give the facts of each incident, and then comment on all of them.

██ I. (1) Plaintiffs' witness Orr testified that he lived at the county seat, and had been engaged in the real estate business about twenty-five years, knew the Korf farm, and was acquainted with the fair and reasonable market value of real estate in Washington county, and in the vicinity of the Korf farm. On direct examination he testified, over objection, to the value of the Korf farm before and after the taking of the right of way. On cross-examination he testified that about three years before he bought, at public auction, a 200-acre farm, south and west of Washington, which was crossed by a Milwaukee Railroad Company track; that it had about 100 acres of pasture and 100 acres of tillable land, and that the land west of Washington was not so desirable as the land east of it. Cross-examination as to how much per acre he paid for the farm was met by the objection that it was immaterial and irrelevant. The objection was sustained. He testified that he had very good results in operating the farm, and thought it was worth considerably more than what he paid for it. Plaintiff's objection to the question as to how much more it was worth—that it was immaterial—was sustained. Neither question called for information that would be of much help to the jury. Its admission was within the discretion of the court, and we find no error.

(2) Orr testified on cross-examination that in arriving at his valuation of the Korf farm he had considered the purchase by Mrs. Latchem of an eighty. On being told by his interrogator that the house did not go with the land, the witness replied that $325 an acre would be a pretty good price for an eighty without a house on it. The cross-question was then asked:

"So, as a matter of fact, in the case of the Latchem property, the fact that the CB&Q Railroad ran through that property the long way from end to end didn't apparently hurt the market value of that property substantially, did it?"

Objection that the question was argumentative was sustained.

(3) The witness then testified on cross-examination that: some pieces of real estate are acceptable to certain buyers and unacceptable to others, at the same price; the judgments of individuals vary considerably upon the desirability of land, and that it had been his experience that a man buying a farm to reside on and operate it is more likely to pay attention to matters of inconvenience than the buyer who lives in town and buys for investment. Defendant then asked:

"So that a prospective purchaser who is not going to live on the land, himself, and who knows that the land has a certain degree of productivity is inclined to overlook matters of purely convenience in the operation of the farm, is that not true?"

The court sustained an objection that the question called for an opinion and conclusion.

With respect to (2) and (3) there was clearly no prejudicial error. There was no abuse of discretion by the court in restricting the cross-examination. The subject matter of each question had previously been fairly answered by the witness. Each was speculative.

(4) Orr testified on cross-examination that he knew of a 240-acre farm, less a Milwaukee right of way, north and east of Washington, which Dr. Lloyd recently purchased, and that he thought it probably brought about what it was worth, although it would have brought a higher price if there had been no railroad across it. He was then asked: "All right. How much would the Lloyd farm have sold for, in your judgment, had there been no railroad through it at the time it did sell less than one year ago?" An objection that the question called for a speculative and immaterial answer was sustained. The witness testified that the right of way went through the best part of the farm, and that he did not know its ratio of tillable and pasture land as compared to the Korf farm. The record disclosed nothing more about the character of the Lloyd land, its improvements, location, or the price at which it sold. Any answer would have been speculative and a guess. There was no prejudice in refusing an answer.

(5) Plaintiffs' witness Breitenbaugh had almost the same qualifications as Orr. He had sold 2,000 acres or more of land during the year preceding the trial. He knew the Korf farm and land values generally in Washington county. He testified to the value of the Korf farm before and after the condemnation. On cross-examination he testified that' Dougherty, who owned the farm before Mrs. Dougherty gave it to Korf, had listed the farm for sale with him in 1941 or 1942. Defendant asked him for the listing price. Objection was made that the information called for was ' immaterial, irrelevant, and too remote. The court sustained it with the remark that "there's been a big change in five years." There was no error in the ruling. What Dougherty offered to sell the land for was immaterial. It was not an admission of the witness. It was not binding on plaintiff and was not proper proof of value when made or of value four years later. There is oftentimes little relation between the asking price and the market value. The rejection of the answer was no abuse of discretion by the court.

(6) This witness, on further cross-examination, testified that the inconveniences and hazards and difficulties incident to the operation of a farm with a railroad right of way separating the buildings from the remainder of the farm, as on the Korf farm, would be just as great with a farm capable of producing 40 bushels per acre as with one producing 80 or 90 bushels to the acre, assuming other factors are equal. Defendants immediately asked: "If you have a farm that is worth only $50 an acre and the railroad right of way is located adjacent to those buildings and cuts the farm off from the buildings, the damage will be just as much as in the case of a farm worth $100 or $150 an acre?" The objection was that the question was hypothetical and not based on any facts in the case and was purely speculative and immaterial. The question was quite fairly answered by the testimony the witness had just given. The information was not very material. It would have aided little in the proper determination of the case. There was little factual basis for it. Its rejection was well within the discretion of the court.

(7) This witness had previously been an appraiser for

defendants in a right-of-way condemnation case. He was asked by defendants if at that time in valuing an eighty cut by a Rock Island right of way he had not said that the land was worth $55 an acre before the taking of the right of way and $40 afterwards. The witness answered that he did not recall what valuations were fixed on that occasion. There was no error, in view of the previous answer of the witness, in sustaining an objection to defendants' question: "Would you say that my statement was incorrect?"

(8) Wenger, witness for plaintiffs, a young farm tenant living about seven miles east of Washington, who was familiar with the Korf farm, and had picked the corn on the place for Cannon in 1946, testified to the value of the farm and of the leasehold, before and after the taking of the right of way. He was cross-examined to the extent of nine pages of the printed record. The Greiner farm of 240 acres is the second farm east of the Korf farm on the same side of the road. It was conveyed to a Mr. Roberts by deed dated February 27, 1946. The witness was cross-examined at length about the farm, although he testified that he knew nothing about the sale to Roberts; that he did not know the farm had changed hands; that he knew where the farm was but had never been over it; he had seen part of the pasture because he had once looked for a calf over in the roughest part; that was the only time he had been on the farm, although he knew where the buildings were; he could not say it was similar to the Korf farm and he did not know how the forties in the farm lay. Defendant then asked: "And one barn there is very good?" An objection of immateriality and irrelevance was sustained. Defendant then asked: "But you do know that this Greiner farm lies just exactly as this Korf farm here?" Objection was sustained with the remark to "not waste too much time." The witness had been cross-examined much about this farm, of which he knew little. He had just testified: "I don't know whether the Greiner farm consists of three forties running north and south and another three forties right beside them, also running north and south."

There was no error in the rulings of the court with respect to the cross-examination of Wenger.

512

Defendants have argued earnestly that the restriction of cross-examinations complained of was so prejudicial to them as to require a reversal. They have cited a number of decisions of this court wherein the importance of thorough cross-examination and the right of a litigant to a full exercise thereof have been vigorously stressed. Among these citations are Jones v. Lozier, 195 Iowa 365, 191 N. W. 103; Schulte v. Ideal Food Products Co., 203 Iowa 676, 213 N. W. 431; Eno v. Adair County Mut. Ins. Assn., 229 Iowa 249, 294 N. W. 323; Glassman v. Chicago, R. I. & P. Ry., 166 Iowa 254, 147 N. W. 757, and others. They have urged that much latitude is allowed in the cross-examination of expert witnesses. These decisions have our full support. Our decision in this case is no departure from them. But it is just as well settled that the conduct of a trial and the scope of cross-examination are necessarily largely within the discretion of the trial court and unless that discretion has been abused to the clear prejudice of a litigant this court does not ordinarily interfere. This is particularly true where the cross-examination was not narrowly circumscribed prior to the adverse ruling. In re Estate of Austin, 194 Iowa 1217, 1221, 1222, 191 N. W. 73; Hayes v. Chicago, R. I. & P. Ry. Co., 239 Iowa 149, 30 N. W. 2d 743; Connelly v. Nolte, 237 Iowa 114, 129, 21 N. W. 2d 311; Youtzy v. City of Cedar Rapids, 150 Iowa 53, 66, 129 N. W. 351. The cross-questions to which objections were sustained were largely directed to collateral matters of little materiality.

II. In question (6), supra, to Breitenbaugh, objection was made that it was hypothetical. Defendants insist that a witness testifying as an expert or one experienced in the subject matter may, in the discretion of the court, be cross-examined on facts and theories having no foundation in the evidence, but wholly assumed, and quote from the often cited case of Bever v. Spangler, 93 Iowa 576, 608, 61 N. W. 1072, in support of their contention. This court has many times so held. For reasons heretofore stated we find no abuse of the court's discretion and no prejudicial error.

III. Defendants' witness Fedderson, an experienced farm operator, had testified quite fully on direct examination

as to the character of the Korf farm, its types of soil, and how it had been farmed. His cross-examination was confined to matters of the direct examination. On redirect examination he was asked if he had any suggestions from the standpoint of efficient operation of the farm, in view of the fact that it now had a railroad across it. Further, how would the farm be affected if the right of way had been placed farther north, and what was the comparative convenience of operation of the farm as it now is, as compared to one where the railroad was a half a mile away? The court sustained objections that the questions called for speculation and guessing and was not a proper measure of damages. Defendants then made an offer of proof, the sum of which was that the farm could be handled in the future as it had been in the past, and that an additional well north of the railroad track might improve the situation. Objection was made to the offer as calling for an opinion and conclusion as to immaterial and irrelevant matters, and to speculative improvements, and was of no aid in arriving at the true measure of damage.

The court said:

"Well, it seems to me that the construction of a well would just be common knowledge, that's all. If they didn't have water over there, they would have to dig a well. I don't think it needs any expert on that. * * * I am going to sustain the objection."

Whether another well would be helpful was hardly a matter of expert opinion. There was no error in the ruling of the court.

■ IV. On January 18, 1947, Korf and Cannon executed a lease of the farm for the year ending in 1948 for a cash rental of $700, with a proviso that if Korf entered into a bona fide contract for the sale of the farm by February 1, 1948, the lease would be of no effect. The court sustained objections to an inquiry for the name of Korf's prospective purchaser. Later the name of the purchaser was made of record. The error assigned is without merit.

■ ■ V. Defendants assigned error because of the introduction by plaintiff, over objection, of certain photographs taken

of the railroad cut during its construction. These exhibits simply showed the conditions as they existed. They were ad-missible as bearing upon the issue of the inconvenience and damage suffered by the tenant from the construction work in his operation of the farm. The jury viewed the cut when it was practically completed and knew its appearance and condition. We are unable to see how the defendants suffered any prejudice by the admission of the photographs.

VI. Defendants assigned error in the refusal to strike the testimony of Cannon, Wenger and Wolfe as to the net leasehold values before and after condemnation.

On direct examination Cannon testified that: before the condemnation his stock had free access from the pasture and any fields in which they might be feeding to the barn lot; in 1944 and 1945 he always kept at least six milk cows and 30 or more head of cattle in all, and around 90 hogs; in 1945 he sold dairy products to the amount of $800; in 1946 he changed the farm operations considerably because of the right of way; he cut down on the number of cattle, and milked but five cows, as it was not practical to milk the cows out north of the right of way and bring the milk in, and it had been impossible from August on to bring the cows to the build-ings for milking; at the time of the trial the crossing was not yet fixed up so that you could drive across it much; the con-struction made it difficult to harvest the crops north of the right of way as they had to be hauled along the cut to the west line of the farm to the road and east along the road to the building, making an extra drive of a half mile on each trip. When he loaded stock he corralled them, with the help of neighbors, in the little barn in the pasture where there were no loading facilities. In 1946 he sold but $100 worth of dairy products. His net income in 1944 was about $3,700 and in 1945 it was about $3,800, and his income tax report showed his net income for 1946 was $1,775. There were no objections to the testimony stated above. He testified that in his opinion the value of his leasehold over and above the rental was $4,000 before the condemnation and $2,000 afterward. On cross-examination he testified that he would have realized a

net income of $4,000 with his labor and equipment if he had had the full use of the farm without the loss of crops and without the inconvenience of the right-of-way burden and could have operated the farm as he had planned. Defendants objected to and moved to strike this valuation testimony upon the grounds that it was immaterial and irrelevant and was an opinion not as to the value of the use of the land or the leasehold but it included the elements of the tenant's labor, implements, material etc., and the production of the farm. The objection and motion were overruled.

The witness Wenger estimated the net value of the leasehold before and after the condemnation was $3,750 and $1,800, respectively. He testified that before the condemnation the farm would accommodate and feed 100 to 150 hogs, 8 milk cows and 12 stock cows with calves, and poultry, but that the amount of livestock that would be carried would be reduced by the right of way. The witness Wolfe lived on the farm adjoining on the west and had been on the farm many times while Cannon lived there. He testified that the 9 or 10 stanchions in the barn before the condemnation were usually filled with milk cows, and many head of cattle and hogs were on feed. He testified to the difficulty of getting machinery, crops, fertilizer and livestock over the crossing, and that it would break up the system of livestock feeding that had been carried on in the past, and make it quite impossible to utilize the building shelters. He estimated the net leasehold value at $4,900 before the condemnation and $2,400 afterward. Other burdens which he considered in arriving at the decreased valuation were the increased cost and inconvenience of operating the farm.

In this division we will also pass upon defendants' complaint that the court erred in overruling their motion for new trial on the ground that the award of $1,350 to Cannon was grossly excessive and the result of passion and prejudice against them.

It is our conclusion that the elements considered by the plaintiff Cannon and the witnesses Wenger and Wolfe in arriving at their respective estimates of the value of the leasehold before and after the taking of the right of way were

proper, and that there was no error in the court's rulings on this testimony.

██ ██ A lease or leasehold in the sense of the term or estate created and not the instrument of grant or conveyance is property, and, as such, when it is taken in the exercise of the right of eminent domain, the lessee is entitled to just compensation, or its equivalent in value. Des Moines Wet Wash Laundry v. City of Des Moines, 197 Iowa 1082, 1085, 198 N. W. 486, 34 A. L. R. 1517; Werthman v. Mason City & Fort Dodge R. Co., 128 Iowa 135, 103 N. W. 135; Renwick v. Davenport & N. W. R. Co., 49 Iowa 664. A farm leasehold has no value to the lessee unless it is used as a farm or farmed. And a farm of 140 acres, in addition to the labor of the occupants, requires the use of tools, implements, horse or other power to operate them, seed, fertilizer, feed, and much other equipment. Good farm husbandry requires poultry and the usual farm livestock to make the most advantageous use of the land and the necessary equipment. When the tenant with labor and the equipment has prepared the ground, seeded, planted and cultivated it, and in July a strip of it is condemned and taken for a railroad right of way across it, and his labor, seed, fertilizer, growing crops, the use of his machinery, its expended operating power, and the ground rent, are lost, he is, of course, seriously damaged. And that damage is not to be based or computed wholly upon the rent or rental which he agreed to pay in his lease, as some testimony for defendants indicates. No tenant would rent a farm if the return he anticipated receiving for the year was just enough to pay the rent he had promised. He expects and hopes that he will have a fair return for his labor and capital over and above the obligations of his lease. That excess is the rental value or the value of the use of the leasehold to the tenant. It is said in Orgel on "Valuation Under Eminent Domain" (1936), section 122:

"The relative paucity of cases denying any compensation to the tenant under a lease of measurable duration suggests that courts and juries are generally ready to assume an excess of rental value over rent reserved. * * *

"It is usually assumed that this market value is equal to the excess of the rental value over the rent reserved." Section 124 (page 418).

Where the whole property is taken and the leasehold is destroyed the measure of damage has been variously stated as the rental value over the rent reserved (In re Matter of City of New York (Seventh Avenue), 196 App. Div. 451, 188 N. Y. Supp. 197); the value of the leasehold over the rents payable (Mason v. City of Nashville, 155 Tenn. 256, 291 S. W. 1074, 1076); United States v. Petty Motor Co., 327 U. S. 372, 66 S. Ct. 596, 90 L. Ed. 729, 734; 29 C. J. S., Eminent Domain, section 143(b). In Des Moines Wet Wash Laundry v. City of Des Moines, supra, 197 Iowa 1082, 1085, 198 N. W. 486, 488, 34 A. L. R. 1517, where the entire property was taken, the recovery was stated to be "the value of the unexpired term of the lease, less the rental reserved."

The same rule applies in the condemnation of a right of way over leased premises and only a part of the leasehold is taken. In Werthman v. Mason City & Fort Dodge R. Co., supra, 128 Iowa 135, 136, 137, 103 N. W. 135, the court instructed the jury that:

"In fixing the amount of damages you will take into consideration the net value of the annual use during the term of this lease; that is, the net value of the annual use of the premises before the defendant appropriated the right of way and took the land and what it was worth afterwards."

The able attorneys on each side took no exception to the instruction. See, also, Renwick v. Davenport & N. W. R. Co., supra, 49 Iowa 664, 674.

In the condemnation of real estate, that is the fee, this court, in Ranck v. City of Cedar Rapids, 134 Iowa 563, 565, 567, 568, 569, 111 N. W. 1027, 1028, 1029, said:

"Generally speaking, the true rule seems to be to permit the proof of all the varied elements of value; that is, all the facts which the owner would properly and naturally press upon the attention of a buyer to whom he is negotiating a sale and all other facts which would naturally influence a person of

ordinary prudence desiring to purchase. * * * the value of growing crops lost by the condemnation, Lance v. Railroad Co., 57 Iowa, 636 [and other cases]; * * * the kind and value of crops produced in other years * * *. It is true that market value and intrinsic value are not necessary equivalents, but proof of the latter is often competent evidence for consideration in determining the former. * * * That is, these items are not to be considered as in themselves affording a basis or measure of recovery, but as explaining and supporting the estimates made of the value of the property as it stands."

The same principle applies in the condemnation of leases. In Des Moines Wet Wash Laundry v. City of Des Moines, supra, 197 Iowa 1082, 1089, 198 N. W. 486, 489, 34 A. L. R. 1517, the court said:

"Ordinarily, market value is the criterion, but in certain cases it is not the true standard by which to determine the value. * * * This is particularly true as applied to a leasehold. Value must be determined by a consideration of the uses to which the property is adapted. All circumstances naturally affecting this value are open to consideration."

Quoting from Bales v. Wichita M. V. R. Co., 92 Kan. 771, 141 P. 1009, L. R. A. 1916C, 1090, the court in the Laundry case said:

" 'Although the interest taken in this case is only a leasehold * * * the same rule applies, viz., the market value of the thing taken. * * * In awarding compensation to a lessee, * * * the market value of the unexpired term should be allowed, taking into consideration as elements of value the situation, condition, and use made, or that may be made, of the premises, and the nature and prosperity of the business carried on there, if it affects the value of the lease.' "

In 1 Nichols "The Law of Eminent Domain", Second Ed., section 233, it is stated:

"Ordinarily, of course, the value of the term is figured upon the basis of the most advantageous use of the estate

* * *. Leases commonly are not assignable without the consent of the landlord, and are so infrequently sold, and vary so much in length of term, rent reserved and other particulars as well as in the character of the property, that it is almost impossible to apply the customary tests of market value to a leasehold interest. It would seem that a lease might well be held to fall within the class of property not commonly bought and sold, and that consequently the intrinsic value, or the value to the owner, might be taken as the best and only available test of market value."

See, also, section 222 in the same volume citing decisions. See McMillin Printing Co. v. Pittsburg, C. & W. R. Co., 216 Pa. 504, 65 A. 1091.

Many other decisions support the principles above noted that a short-term farm lease such as was held by the plaintiff Cannon has no market value that can be proved in the usual methods of proving market value, and that therefore it is proper and necessary to prove every factor and element showing its actual and intrinsic value—the productivity of the soil, the yield and value of the crops, the net income. Such evidence is material and competent to establish such market value as the leasehold has.

Concerning proof of the value of such property, the court, in San Diego Land & Town Co. v. Neale, 78 Cal. 63, 68, 20 P. 372, 374, 3 L. R. A. 83, said:

"Some property is not in actual demand and has no current rate of price. In such case it has been sometimes said that the property has no market value, in the strict sense of the term. * * * And in one sense this is true. But it is certain that a corporation could not for that reason appropriate it for nothing. From the necessity of the case the value must be arrived at from the opinions of well-informed persons, based upon the purposes for which the property is suitable. This is not taking the 'value in use' to the owner as contradistinguished from the market value. What is done is merely to take into consideration the purposes for which the property is suitable, as a means of ascertaining what reasonable purchasers would in

all probability be willing to give for it, which, in a general sense, may be said to be the market value."

In Hayes v. City of Atlanta, 1 Ga. App. 25, 30, 57 S. E. 1087, 1089, the court referring to a tenancy at will which had no market value said:

"Consequently the damages to it must be determined in the same manner as the damages to other things which have no market value must be ascertained, that is to say, by an impartial jury, in the light of all the proved facts and circumstances."

Defendants argue that estimated profits must not be considered. We have no quarrel with this rule. Here the estimated profits were not in the distant future but were almost in the present and based upon existing conditions and farm returns of the past two years. As said in Pause v. City of Atlanta, 98 Ga. 92, 105, 26 S. E. 489, 493, 58 Am. St. Rep. 290:

"[While profits lost] are not recoverable by way of damages, [yet] evidence that the business was profitable is admissible to illustrate and throw light upon the value of the premises for rent."

See, also, In re City of Seattle, 52 Wash. 226, 100 P. 330, 333.

In Alabama Power Co. v. Herzfeld, 216 Ala. 671, 674, 114 So. 49, 52, the court said:

"Income is an element of market value. 'The value of property, generally speaking, is determined by its productiveness— the profits which its use brings to the owner.' Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463. 'The net revenue arising from the use of land may be shown on an issue as to value, although it does not furnish a conclusive test.' 22 Corpus Juris 181."

On the assigned error that the award to the tenant is excessive and indicative of passion and prejudice, we find nothing in the record to sustain it. Cannon had a good lease. He was paying $10 an acre and he testified that a fair cash rental was $12 an acre. No one contradicted it. He was entitled

to the benefit of his bargain. He lost 350 bushels of corn from the land taken. It was worth $1.20 a bushel at the time of the trial. He lost clover seed and hay from ground taken. He sold $800 worth of dairy products in 1945 and but $100 worth in 1946. His net returns in 1944 and 1945 from the farm were respectively $3,700 and $3,800. In 1946 they were $1,775. In addition to the direct loss from the taking of approximately seven acres of the farm, he suffered consequential injuries to the remainder of his leasehold in the additional expense and inconveniences of operating the farm. These various items and elements are not to be considered as specific amounts of damage to be added together in computing the loss, but are simply to be considered in arriving at the fair and reasonable value of the leasehold over and above the rent reserved in the lease both before and after the appropriation of the right of way. The award of $1,350 to Cannon is amply sustained by and is well within the evidence. The four witnesses of defendants place the value of the use of the farm before the taking at $1,400— merely the rent reserved in the lease—although he had spent four months or more in putting in and caring for his crops. They estimate the depreciation in the leasehold by the condemnation at respectively $800, $700, $650 and $600. In support of his estimates one of these witnesses testified:

"I would think that Cannon's leasehold interest * * * was worth $1400. I took his own figures as to the rent he was paying. * * * Of course, he supposed he was going to make more money than $1400 by farming the place, but that still did not change the fact that the lease was worth $1400. If he had only been paying $500, I would say that that was what it was worth."

According to his reasoning the better the lease the tenant had and the less rent he paid, the less the leasehold would be worth. Bearing upon this matter it is said in Kafka v. Davidson, 135 Minn. 389, 395, 160 N. W. 1021, 1023:

"If plaintiff [the tenant] had made a bad bargain, and the fair rental value of the premises was less than the rent he had agreed to pay, he * * * sustained no damage. But if he

had made a good bargain and the fair rental value of the premises was more than the rent * * *, he did sustain damage."

Neither assignment of error considered in this division is good. See citations in Division VII.

VII. Defendants assign error upon the overruling of their motion for new trial on the ground that the verdict of $8,750 to Korf was excessive and indicates passion and prejudice was the cause. Plaintiff used five qualified witnesses—farmers and realtors of the vicinity. Defendants used six witnesses equally qualified, but not quite so familiar with the farm. We tabulate their testimony. Plaintiffs' is set out first:

| Witness | Value Before Taking | Value After Taking | Damages |
|---|---|---|---|
| Wenger ......... | $28,000 | $11,700 | $16,300 |
| Orr ............. | 28,000 | 13,300 | 14,700 |
| Wolfe .......... | 28,000 | 13,300 | 14,700 |
| Breitenbaugh .... | 28,000 | 11,700–13,300 | 14,700–16,300 |
| Patterson .......25,200–28,000 | | 11,700–13,300 | 13,500–14,700 |
| Defendants' Witnesses | | | |
| Schmoeller ...... | $17,500 | $12,000 | $ 5,500 |
| Fedderson ....... | 17,500 | 11,730 | 5,770 |
| Knock. .......... | 18,700 | 13,575 | 5,175 |
| Wiley .......... | 21,000 | 15,000 | 6,000 |
| Trotman ........ | 20,250 | 14,750 | 5,500 |
| Duensing ........ | 20,670 | 14,655 | 6,115 |

The average damage according to the plaintiffs' witnesses was $15,340 taking their highest estimates. The average for defendants' witnesses was $5,800. The jury awarded $8,750 or $1,820 less than a split of the difference. Apparently they followed the court's instruction that in weighing the testimony they be guided by their own good judgment. Defendants conceded substantial damages. It would be only human nature that the concession was conservative. It needs no argument to convince any fair-minded person that the damage to the farm is a serious one. In the eyes of the law it is there for all time for practical purposes. The damage to the tenant's leasehold for 1946 is estimated by defendants to be from $600 to $800. Necessarily the owner's rental will annually be decreased in

proportion. The capitalized present value of the aggregate annual damage to the farm through the years to come would be a substantial sum. The sheriff's jury awarded Korf $7,750 and the court jury added $1,000. We find no reason for, nor evidence of, the amount of the award being the result of passion or prejudice. The language of the court in Longstreet v. Town of Sharon, 200 Iowa 723, 727, 205 N. W. 343, 344, applies here:

"It is further urged that the verdicts are excessive. A condemnation case is one in which the amount allowed is peculiarly within the province of the jury; and unless the same be shown to be so extravagant as to be wholly unfair and unreasonable, this court has repeatedly refused to interfere with the verdict of the jury."

See Cory v. State, 214 Iowa 222, 228, 229, 242 N. W. 100; Cutler v. State, 224 Iowa 686, 690, 691, 278 N. W. 327; Millard v. Northwestern Mfg. Co., 200 Iowa 1063, 1066, 205 N. W. 979; Kemmerer v. Iowa State Highway Comm., 214 Iowa 136, 142, 143, 241 N. W. 693; Stoner v. Iowa State Highway Comm., 227 Iowa 115, 120, 287 N. W. 269; Hubbell v. City of Des Moines, 166 Iowa 581, 595, 147 N. W. 908, Ann. Cas. 1916E, 592; Kosters v. Sioux County, 195 Iowa 214, 217, 191 N. W. 993; Bracken v. City of Albia, 194 Iowa 596, 600, 189 N. W. 972; Evans v. Iowa Southern Util. Co., 205 Iowa 283, 290, 218 N. W. 66.

██ VIII. Korf asked that the railroad crossing be placed where the lane intersected the right of way. This was the most reasonable place to locate the crossing for the best operation of the farm. The defendants acceded. Because of the depth of the cut the approaches to the track crossing extended beyond the right of way on each side. Defendants' obligation to provide an adequate crossing is required by another statute having nothing to do with condemnation proceedings. Defendants assign error in the court's refusal to give a requested instruction about fencing these approaches. We think the court's instruction was adequate and proper, and there was no error in the refusal.

██ IX. Defendants have assigned two separate errors which involve the same matter and we will dispose of them in

this division. It is the contention of the defendants that damages to the farm should have been determined as though Korf had been operating it from March 1, 1946 to March 1, 1947, and one award should have been made to him for all damages to the fee caused by the condemnation, and that from that award as a unit any damages to the leasehold should have been deducted from this award in gross and apportioned to Cannon. They complain of instructions Nos. 7, 10 and 14 in which the jury was told to make separate awards to the owner and the tenant. It is their theory, or it is the effect of that theory, that the compensation for which they are liable should be no greater when a farm is occupied by a tenant at the time of condemnation than it would be if it were occupied and operated by the owner at that time. In other words, that the damage to Korf as owner and the damage to Cannon as lessee should be no greater than the damage to which Korf would be entitled were he operating the farm. Defendants requested this instruction:

"You are instructed that in making your award you will first determine the damage to the farm as a unit including any loss or damage to growing crops upon the 6.69 acres appropriated by the railroad. After you have determined the damage to the whole farm as herein instructed you will apportion to Charles Cannon the amount to which you find he is entitled under these instructions and deduct such sum from the whole damage to the farm."

This instruction was refused. We do not believe that defendants were prejudiced thereby, or that the total compensation as awarded to Korf and Cannon was any greater than the unit or gross award which the jury would have first allowed to Korf under the requested instruction. This is true because of the way the case was tried.

The proper measure of damages to a tract of land where the ownership is undivided and the fee is in the owner, and a right of way is condemned across it, is the difference in the market value of the land just before the taking by condemnation and the market value immediately after said taking. In such case, since the owner has the undivided fee, he is entitled to the entire award of damages or compensation thus ascertained. But if the

property is subject to a lease, the lessee is also entitled to compensation for the damages to his leasehold. That was the situation in this case. The record showed that Cannon had a lease for one year terminating on March 1, 1947, at a cash rental of $10 an acre. Each valuation witness of the plaintiffs was asked this question:

"Now, in your opinion, what was the fair and reasonable market value of this Korf 140 acres of land, burdened with a lease expiring on the first day of March, 1947, immediately before the taking of the right of way through it, which occurred on or about June 26, 1946?"

This question was objected to as not bearing on the proper measure of damage, it being immaterial whether the property was leased or otherwise. A question worded in the same way was then asked the witness as to the market value after the right of way had been taken. These questions were asked to ascertain the award to which Korf was entitled, and it must be assumed that the witnesses in their answers to these two questions reduced the answers by the amount of compensation which in their opinion Cannon was entitled to for damage to his leasehold. Some of these witnesses had given testimony to the damage to the leasehold. The court in instructing the jury had told them, in instruction No. 11, that in fixing the value of the farm before and after the condemnation the amount so fixed must be based upon the evidence, "taking into consideration that the said land was under lease to one Cannon from March 1, 1946 to March 1, 1947." In instruction No. 13 speaking of the answers to the two questions above noted, the court said:

"The difference between the two values will be the plaintiff's [Korf's] measure of damages taking into consideration the fact that the land is encumbered with a lease from March 1, 1946 to March 1, 1947."

We must assume that the jury gave effect to these instructions and that its award of $8,750 to Korf and $1,350 to Cannon was approximately "the damage to the farm as a unit" as stated in defendants' requested instruction set out herein. The defendants while objecting to the questions asked by plaintiffs of their valuation witnesses asked the same questions of their

valuation witnesses in seeking to ascertain the damages owing Korf. Each witness was asked his opinion of the market value of the 140 acres before and after the taking, "burdened with a lease to expire March 1, 1947." The court submitted the case on the theory on which each side submitted its case with reference to the award allowed to Korf. Each side adopted the same theory in the introduction of its testimony as to the before-and-after valuation of the farm in the ascertainment of the award to Korf. The court gave effect to this theory in its instructions. The defendants, having adopted this theory, are not in a position to complain. There is no reason to believe that the award to each plaintiff would have been materially different had the above-noted requested instruction of defendants been given.

Furthermore, in Wilson v. Fleming (these same defendants), 239 Iowa 718, 31 N. W. 2d 393 (March 9, 1948), a case very similar to this one, this court refused to accept the theory of law contended for by defendants, as stated in the fore part of this division, and held that the landowner and his lessee were entitled to have the damage to the fee and the leasehold assessed separately.

It is therefore not necessary to pass upon defendants' said theory of the law nor to discuss the authorities cited by them, to wit, 18 Am. Jur., Eminent Domain, section 239; State ex rel. McCaskill v. Hall, 325 Mo. 165, 28 S. W. 2d 80, 69 A. L. R. 1256; City of St. Louis v. Rossi, 333 Mo. 1092, 64 S. W. 2d 600; Bartlow v. Chicago, B. & Q. R. Co., 243 Ill. 332, 90 N. E. 721; Edmands v. City of Boston, 108 Mass. 535; Providence, F. R. & N. S. Co. v. Fall River, 187 Mass. 45, 72 N. E. 338; State ex rel. Kafka v. District Court, 128 Minn. 432, 151 N. W. 144; Pennsylvania R. Co. v. National Docks Co., 57 N. J. Law 86, 30 A. 183; Wiggin v. New York, 9 (Paige) N. Y. 16; City of Portland v. Postill, 123 Or. 579, 263 P. 896; Spaulding v. Milwaukee, L. S. & W. Ry. Co., 57 Wis. 304, 14 N. W. 368, 15 N. W. 482; 2 Lewis on Eminent Domain, Third Ed., 1253.

The judgment is—Affirmed.

MULRONEY, C. J., and OLIVER, HALE, GARFIELD, MANTZ, SMITH, and HAYS, JJ., concur.