No. 45,902

City of Bonner Springs, *Appellant,* v. James R. Coleman et al.,
*Appellees.*

(481 P. 2d 950)

Opinion filed March 6, 1971.

*Donald H. Corson, Jr.,* of Kansas City, argued the cause, and *James H. Barnes* and *Wayne H. Phillips,* both of Kansas City, were with him on the brief for the appellant.

*J. D. Lysaught,* of Weeks, Thomas, Lysaught, Bingham and Johnston, Chartered, of Kansas City, argued the cause, and *L. D. McDonald,* of Weeks, Thomas, Lysaught, Bingham and Johnston, Chartered, was with him on the brief for the appellees.

The opinion of the court was delivered by

Hatcher, C.: This is an appeal by the condemner from a verdict in a condemnation case.

There is but a single question requiring our consideration—was it error to admit into evidence the testimony of the landowners and exhibits showing the gross income from the business operated on

or about the condemned property for the purpose of showing the value of the property and the damages to the landowners?

The land was being condemned for street and highway purposes by the city of Bonner Springs, Kansas. During the years 1963 to 1967, the appellees owned and occupied the real property, a part of which was condemned in this action. The property consisted of a tract of land with a 225 foot frontage and 125 feet deep. It contained a brick and tile building 50 feet wide by 105 feet deep which had been an old silent movie theater. Prior to the time the appellees occupied the property it had stood vacant for six or seven years. Improvements were made over the course of several years including the addition of a paint and body shop. At the time of the condemnation the Colemans engaged in the business of selling farm equipment, trucks and parts, and rented and repaired farm equipment and trucks. They also sold ITCO parts, appliances and hardware. The largest dollar volume of the business consisted of the farm equipment and truck sales.

At the trial in the court below the landowners first introduced their evidence.

Mr. James R. Coleman, the owner of the land and the operator of the business thereon, testified in substance to the facts above. He further testified:

"Q. All right, sir. Without going into those specific figures, Jim, do you have any indication as to how your store was doing, generally speaking, in the area?

"A. Do you mean in dollars?

"Q. No, stay away from dollars. Did you win any awards?

"A. For the last four years—it could have been five, I am not sure—we have been the top-volume dealer for the J. I. Case in the Kansas City branch, and that covers all of Kansas, part of Colorado, part of Missouri, and part of Arkansas."

Mr. Coleman made no attempt to give an opinion as to the value of the land condemned or the damages resulting.

Mrs. Golden Coleman, wife of James R. Coleman, next took the witness stand. She testified that she was responsible for the bookkeeping and had prepared an itemization of the gross income from the business broken into different categories. She also had a final yearly total for the gross income for the year 1967. These calculations were introduced as exhibits.

The exhibits showed the business produced for 1963 a gross income of $607,000.00, for 1964 a gross income of $706,000.00, for

1965 a gross income of $885,000.00, for 1966 a gross income of $1,229,000.00 and for 1967 a gross income of $1,229,000.00.

The exhibits also divided the gross income for 1966 into the following categories:

"Farm machinery and trucks—Sales and rentals .............. $1,026,416.00
Machinery Parts ...................................... 105,545.00
ITCO Parts .......................................... 15,364.00
Appliances and Hardware ............................. 40,967.00
Labor ............................................... 37,490.00
Miscellaneous ....................................... 3,620.00"

The exhibits further showed that the gross income of the business increased 100% between 1963 and 1967.

Golden Coleman made no attempt to adjust the gross income to reflect estimated values. Neither did she give any opinion of property values or damages to the landowners.

Although the annual gross income of $1,229,000.00 was left dangling before the jury, it does not appear that the figure was ever used to prove any point in the case.

Appellees' first expert witness testified:

"Q. Would you tell the jury specifically how you used the gross income and the percentages to arrive at your valuation on the income approach?

. . . . . . . . . . .

"A. After checking the gross volume that the business was doing and analyzing the business, it was my opinion, due to additional land, that the tractor sales and the machinery sales, although it was the largest volume of the business, I assigned no percentage rental to that; I think that would be speculation, I think to a degree it's order-taking and it's a wonderful operation, but I think if Mr. Coleman was a tenant of mine, I don't think he would agree to pay me percentage rental on his farm machinery. . . ."

He further testified on cross-examination:

"Q. Mr. Stanley, if I understood you correctly—there has been considerable mention of the implement business and of the additional lots. For the purposes of your income approach only, is it a correct statement that you used approximately one-fifth of the total gross income of the Colemans for purposes of establishing your income approach evaluation?

"A. It figures approximately one-fifth—what I used, other than the implement business—the sales of implements, new and used implements.

"Q. So, in other words, that $1,000,000.00 that they had in addition to that, you didn't even consider for purposes of figuring your lease rental?

"A. No, it was attributed to other factors."

It would appear that the witness did not use the $1,000,000.00 gross income derived from the implement business, although it was shown in appellees' exhibits introduced in evidence.

Appellees' second expert witness testified that he arrived at a figure of $76,094.00 as the value of the property before the taking based on cost of replacement less depreciation. He also used the gross income approach and arrived at a comparable figure of $86,-800.00. We quote his testimony in part:

"Q. Now, when you have a conflict in the two methods of approach that you used in the evaluation of this property, Mr. Vickers, how do you reconcile this? Tell the jury what you feel are the damages to the Colemans.

"A. Well, the way that I reconcile this is because there is a considerable disparity in its valuation. The operation that Mr. Coleman conducted at this point had somewhat to do with location of part of his business in a section not at this location.

"Q. Would that be the rental lot that we referred to earlier?

"A. The rental lot we referred to. I took that into consideration, also, in my value before, *but even taking it into consideration and deducting a large figure for the capitalizing of the rent that he* [landowner] *paid for that lot of $46,666.00, I still arrive at its valuation indicated by capitalization of $86,000.00.* This would indicate that it's a very valuable property for his business. Generally speaking, the cost of replacement less depreciation should be the ceiling of value; this should be the ceiling or the topmost value; so, therefore, if I am to arrive at a valuation of this property, I would have to go back to the cost of replacement less depreciation, because this is what I think that this property could be replaced for—$76,094.00—so that it's my opinion that the value of the property, irrespective of the higher figure due to the income or capitalization approach—the value of the property before the taking was $76,094.00." (Emphasis ours.)

We are not informed of the exact amount the witness deducted from the gross profits before he attempted to arrive at his rental figure for the purpose of capitalization, but we are informed that it was a large figure. We are also informed that he discarded the value so arrived at in favor of the value arrived at by cost of replacement less depreciation.

Appellees' third expert witness testified:

"Q. Excuse me, Mr. Martin, maybe I misunderstood. You are indicating to the jury you did not use the income approach, sir?

"A. That's correct, I did not use it because both he and his wife worked in their business and I don't think it would be a fair approach because his sales far exceeded the average business of that nature."

He also mentioned the gross sales and stated:

". . . Now, if I come in here with an income approach, I think it would be a little bit ridiculous; in other words, it would be lots higher than what I am using."

He did not use an income approach.

The appellant contends it was error to admit into evidence the landowners' testimony and exhibits showing gross sales where gross sales are not competent evidence and particularly where the evidence is not necessary to support an appraisal value or used by experts in arriving at their value of the land.

We are forced to agree.

The narrow limits of appellant's objection must be understood. No objection is made to expert witnesses ascertaining the gross income of the business being conducted on the condemned land and using it in arriving at an estimated value by the gross sales method. The appellant's objection goes to the submission of the gross sales directly to the jury for their independent consideration.

This is well illustrated in a colloquy between court and counsel:

"MR. CORSON: I don't think it's improper for the appraisers to take this into consideration in arriving at whatever assumed rental figure they arrive at; however, I think it's improper to flaunt these figures showing thousands and thousands of dollars worth of business, which is not attributable to the land, before the jury; it is highly prejudicial and inflammatory.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"MR. CORSON: I have no objection to the appraisers learning of that in the course of their investigation and taking it into consideration. My objection is putting it directly in evidence before the jury.

"THE COURT: If I make a mistake on this, it could be rather fatal. If you, Mr. McDonald, representing the landowners, feel sure of your position, I'll go along with you and let you show it, this with the understanding that I take no responsibility for it. I don't know for sure whether it's proper. If it's improper, I would guess it would be reversible error.

"MR. CORSON: It certainly would."

This court has approved the use of the gross sales method by expert witnesses in arriving at an estimated value of land affected by eminent domain proceedings. In *Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, 332 P. 2d 539, at page 783 of the opinion we quoted with approval from *State Roads Com. of Md. v. Novosel*, 203 Md. 619, 102 A. 2d 563, as follows:

" 'With the increasing vogue of leases of business property reserving rentals computed on a percentage of the volume of business transacted by the tenant, it would be artificial and illusory to reject an expert opinion of rental value that takes into account the volume of business which experience has shown a particular piece of property is capable of producing; and, of course, the resulting profits may be, if anything, even more pertinent to the question of value. We find no basis for the objection either to the testimony of the expert, or to that of the owner who as such, irrespective of other qualifications, is permitted to give his estimate of the value of his holdings. *Bailey*

*v. Ford,* 151 Md. 664; *Pennsylvania Threshermen & Farmers Mutual Casualty Ins. Co. v. Messenger,* 181 Md. 295, 302; *Jackson v. Linthicum,* 192 Md. 272, 276; 3 *Wigmore on Evidence* (3rd Ed.), Sec. 716.' (pp. 624, 625.)

"See, also, *Korf v. Fleming,* 239 Ia. 501, 32 N. W. 2d 85; *L. & N. Turnpike Co. v. Creveling,* 159 Tenn. 147, 17 S. W. 2d 22; and *H. & H. Supply Co. v. United States,* 194 F. 2d 553."

Also, in Jahr on Eminent Domain, § 147, p. 226, it is said:

"At the outset, it is important to bear in mind that *the courts distinguish between the income from a business conducted on real estate and the income from rents that the real estate produces. The former income is generally excluded* as we shall show below. But the income from rents is admissible. To be sure, rental income from real estate is to some degree income from a business, and the net income from it is actually the profit. Nevertheless, this income is more likely to continue when the property is sold in the market; whereas a business conducted on the property by the owner is generally excluded from the sale. The business there does not go with the sale of the property." (Emphasis supplied.)

A naked statement of gross income is too uncertain and depends upon too many speculations and contingencies to safely be accepted as evidence of the usable value of property upon which a business is carried on.

This court has never recognized the right to submit directly to the jury evidence of gross income from which the jury is to estimate the value of real property or the damage to the landowners because of the taking in an eminent domain proceeding.

The gross profits of a business depend upon the extent, character and manner in which it is carried on. One man may prosper while another goes bankrupt conducting the same business upon the same property.

The rule and the reasons for it are well expressed in Nichols on Eminent Domain, Vol. 5, § 19.3 [1], p. 19-48. We quote:

"If the owner of property uses it himself for commercial purposes, the amount of his profits from the business conducted upon the property depends so much upon the capital employed and the fortune, skill and good management with which the business is conducted, that it furnishes no test of the value of the property. *It is, accordingly, well settled that evidence of the profits of a business conducted upon land taken for the public use is not admissible in proceedings for the determination of the compensation which the owner of the land shall receive.* The profits of a business are too uncertain, and depend on too many contingencies safely to be accepted as any evidence of the usable value of the property upon which the business is carried on. Profits depend upon the times, the amount of capital invested, the social, religious and financial position in the community of the one carrying it on, and many other elements which might be suggested. What one man might

do at a profit, another might only do at a loss. That the owner has made profits in his business in the past is no indication that he will continue to make them in the future." (Emphasis supplied.)

The author cites federal cases and numerous cases from twenty-two states as authority for his statement. We will not extend this opinion by repeating the citations here.

We must conclude that as a general rule the gross profits from a business, standing alone, furnish no test of the value of the property.

There are, of course, exceptions to the rule but none of the exceptions are present here and it would be out of place for us to attempt to list them.

It must also be understood that once a witness has qualified as an expert, a court cannot regulate the factors he uses or the mental process by which he arrives at his conclusion. These matters can only be challenged by cross-examination testing the witness' credibility.

An expert witness may take the gross profit from a business and reduce it to rent and then capitalize the rent for the purpose of arriving at the value of the property on which the business is located. However, it is to be expected that the expert will be well enough informed that he will recognize the uncertainties and contingencies and eliminate them or make proper allowances.

What the expert witnesses for appellees did in this case presents a fine example—one of appellees' witnesses deducted $1,000,000.00 from the gross income figure submitted because it was income from the sale of tractors and machinery conducted on other land and consisted largely of order-taking, and another of appellees' witnesses deducted a large figure from the gross income for similar reasons.

Appellees suggest that even though the evidence of gross profits was erroneously admitted, there was substantial competent evidence submitted which supported the verdict and therefore there was no prejudicial error.

The verdict submitted was within the range of the estimates submitted by appellees' witnesses but it was far over appellant's estimate as to amount of damages to the landowners, otherwise it would not be here. In determining whether error in the admission of evidence is prejudicial it is proper to examine the evidence in the light of the entire record. (*State v. Appleby*, 155 Kan. 871,

130 P. 2d 568.) We are impressed with the trial court's expression in stating some doubt as to the admissibility of the evidence—"If it's improper, I would guess it would be reversible error."

It would be presumptuous for us to state, as a matter of law, that the jury was not prejudicially impressed by evidence of an annual gross income of $1,229,000.00 from the business while only one-fifth of the amount was to be attributed to the real property affected by the condemnation proceedings.

The judgment is reversed with instructions to grant a new trial.

APPROVED BY THE COURT.

FROMME, J., not participating.

SCHROEDER, J., dissenting: The decision of the court on the issue here presented does little more than attribute incompetence to the jurors who served at the trial. In my opinion this is unwarranted.

Counsel for the appellant conceded in the trial court the use of gross receipts in arriving at a rental figure to ascertain the fair market value of a piece of property by the income approach was proper. He stated:

"I have no objection to the appraisers learning of that in the course of their investigation and taking it into consideration. My objection is putting it directly in evidence before the jury."

In substance, the court says to permit a witness to testify and give his expert opinion based upon certain facts readily provable is proper, but the facts upon which the opinion is based must be barred from the record.

The expert in arriving at his opinion on property valuation by using the income approach must ascertain the rental value of the property by taking into account the volume of business which experience has shown the particular piece of property is capable of producing. Undoubtedly, should the expert witness attempt to render such an opinion without the evidence of sales upon which it is based, an objection could be made that no proper foundation had been established for the opinion. Thus, proof of sales, in this case gross receipts, actually made over a period of years was necessary to support an expert's opinion upon which he calculated the economic rent attributable to the property condemned.

In the trial of this case the expert real estate witnesses who testified agreed there are three generally accepted approaches used by

appraisers in valuing property: (1) The market data approach which is based upon what comparable properties had sold for; (2) the depreciated replacement cost or cost approach which is based upon what it would cost to acquire the land and to build equivalent improvements less depreciation; and (3) the income approach or capitalization of income which is based upon what the property is producing or is capable of producing in income.

The income approach was recognized by this court more than a decade ago in *Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, 332 P. 2d 539, and has subsequently been followed.

The special circumstances under which *Eisenring* was applicable were said to exist by at least one of the expert witnesses in this case—that the income approach is the best method of determining value when it is a known factor and there are no other comparable real estate sales, as here.

On appeal the court is concerned with the admission into evidence of gross sales figures which enabled the expert witnesses to compute the economic rent to which the subject premises would be entitled under the type of percentage leases shown by the evidence to be applicable to similar operations. Thus, the complaint of error assigned on appeal *is limited solely to evidence tendered as a foundation for the income approach.*

There was expert testimony in the trial that the income approach was used to a far greater extent in valuing commercial property because such properties are bought for their ability to produce a return.

Now the jury heard all the testimony including that on direct and cross-examination, and was well apprised of the facts and the extent to which the gross income figures were used in valuing the property here in question. In my opinion the jury was competent to weigh such evidence, sift out the chaff and give credence where it was deserved. It is the function of opposing counsel on cross-examination of the expert witness to bring out all relevant facts to assist the jury in this determination. (See *Cline v. Kansas Gas & Electric Company*, 182 Kan. 155, 159, 318 P. 2d 1000, dissenting opinion.)

Under K. S. A. 26-508 (effective January 1, 1964) an appeal taken from an award in the condemnation action "shall be docketed as a civil action [in the district court] and tried as any other civil action." (Now K. S. A. 1970 Supp. 26-508.)

Our present code of civil procedure also became effective January 1, 1964. It incorporated Article 4, which is a uniform code of evidence. As such it is applicable to the trial of condemnation actions.

Under K. S. A. 60-407, all evidence is admissible if it is relevant to the issue being investigated, but where a party may be prejudiced by the admission of evidence, the trial judge may in his discretion exclude it, if he finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered. (K. S. A. 60-445; and *State v. Hinton*, 206 Kan. 500, 479 P. 2d 910.)

Clearly, on the record here presented, there was no surprise to the appellant because his counsel informed the jury in his opening statement that the landowner was "going to show the amount of business." At any rate, the trial judge in the exercise of his power of discretion admitted the evidence, and there is no showing the trial judge abused the exercise of his power of discretion in admitting the evidence.

Resort to condemnation cases prior to January 1, 1964, concerning the evidence admissible in the trial of condemnation actions is fraught with danger. For example, this court recognized it to be proper for the landowner in the trial of a condemnation action to examine his own expert valuation witnesses *on direct examination* concerning similar sales to disclose their knowledge and bolster their opinion. (*Ridglea, Inc. v. Unified School District*, 206 Kan. 111, 476 P. 2d 601.) Under the old rules, such examination of the landowner's expert witnesses was highly improper. It was only upon the cross-examination of such expert witnesses, prior to the new code of civil procedure, that similar sales could be brought into evidence in an effort to test the credibility of the value expert.

In my opinion the court fails to recognize our new code of evidence applicable in the trial of condemnation actions, and is confusing the condemnation law in this state by resorting to old concepts. Cases from other jurisdictions relied upon to bolster the court's opinion fall in this category. (Kansas is one of the first states in the union to adopt the uniform code of evidence.)

The court tends to treat the gross income figures used by the appellant in the trial of this action as novel. It is common knowledge that the rental value of many leases on commercial properties, particularly in shopping centers, is based in substantial part upon a fair percentage *of the gross receipts*.

The use of percentage leases and capitalization of the rental derived therefrom to determine the fair market value of commercial properties is neither new, novel nor theoretical, as stated in Percentage Leases, The Basis of Equality Between Lessor and Lessee (11th Ed. 1967, published by the Commercial and Investment Division of the National Institute of Real Estate Brokers of the National Association of Real Estate Boards):

"During the last 30 years, almost every important lease of retail business property has contained a provision for percentage rental. It has proved to be a fair and equitable method of effecting a satisfactory rental contract for both parties. To estimate fair market rental value of commercial real estate, it is necessary to determine its productive value, the income that it is capable of producing. Its fair rental value is the amount of rent that users of the property can be expected to pay. What a user can pay is generally based, like all other operating expenses of any business, upon the reasonable percentage of the volume of business that a lessee of the property can afford.

*"This is a standard basis, now widely applied, used by Boards of Assessors and some of the Courts, to determine the fair market value of commercial properties."* (p. 11.) (Emphasis added.)

In The Appraisal of Real Estate (4th Ed. 1964, published by the American Institute of Real Estate Appraisers of the National Association of Real Estate Boards), it is stated:

"It should now be apparent that the capitalized income method is actually the direct method of estimating value and that the accrued depreciation estimate in the cost approach is its by-product. The income approach contemplates that deterioration and obsolescence operate to reduce either or both the quantity and the duration of the net income which the property can produce. Hence, the influence of physical, functional, and economic depreciation on value is reflected in the income-stream estimate. Under the income approach, therefore, the influence of depreciation—existing or anticipated—is provided for in the process of estimating the quality, amount, and probable duration of the income and, consequently, property value." (p. 208.)

The subject is dealt with extensively in McMichael & O'Keefe, Leases, Percentage, Short and Long Term (5th Ed. 1959). In this connection see, also, *Garvey Grain, Inc. v. MacDonald,* 203 Kan. 1, 15, 453 P. 2d 59, both court and dissenting opinions.

Even assuming the trial court erred in admitting evidence of the gross income the property here in question was capable of producing annually, there were three well-qualified real estate appraisers who testified as to the value of the property based on the valuation of the land arrived at by the market data, or sales of comparable properties, approach and the valuation of the improvements based on the cost of replacement less depreciation approach.

By this approach and in accordance with K. S. A. 26-513 (*c*), the difference between the value of the entire property immediately before the taking and the valuation of that portion of the tract remaining immediately after the taking (this being the total damages to the landowner) was testified to by Scott Stanley as being $50,000; by Rex Vickers as being $54,623; and by Kenneth Martin as being $57,068. There was no objection to this evidence and no contention is made on appeal that such evidence was incompetent for any reason. The jury's verdict of $48,000, on which judgment was entered, was well within the range of value testimony established by these expert witnesses. (*Kansas State Highway Commission v. Roepke*, 200 Kan. 660, 438 P. 2d 122.) Therefore, the admission of the evidence of gross sales to form a foundation for valuation by the income approach could, at best, amount only to a technical error or irregularity which did not prejudicially affect the substantial rights of the appellant, and should be disregarded pursuant to K. S. A. 60-2105 and K. S. A. 60-261.

It is respectfully submitted the judgment of the lower court should be affirmed.