No. 97,581

UNIFIED SCHOOL DISTRICT NO. 232, JOHNSON COUNTY, STATE OF KANSAS, *Appellee,* v. CWD INVESTMENTS, LLC, and DUGGAN HOMES, INC., *Appellants.*

(205 P.3d 1245)

Opinion filed April 17, 2009.

*Lynn Hursh*, of Armstrong Teasdale, LLP, argued the cause, and *Darren K. Sharp*, of the same firm, and *Deron A. Anliker*, of Duggan, Shadwick, Doerr & Kurlbaum, P.C., of Overland Park, were with him on the brief for appellants.

*W. Joseph Hatley*, of Spencer, Fane, Britt & Browne LLP, of Kansas City, Missouri, argued the cause, and *Melissa Hoag Sherman*, of Lathrop & Gage, L.C., of Overland Park, was with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: In an eminent domain appeal to the district court, a residential subdivision developer and its affiliated homebuilder challenged the court-appointed appraisers' valuation of a part of their property condemned by a school district. Before their jury trial, the district court granted several school district motions excluding evidence of certain categories of damage claims. A jury later awarded damages of $718,100.

The developer, CWD Investments, LLC, and the homebuilder, Duggan Homes, Inc., appeal those damage-limiting court rulings and the jury's award. The school district cross-appeals. This court has jurisdiction pursuant to K.S.A. 26-504 and 60-2101(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in granting partial summary judgment to bar several of defendants' damage claims for their failure to come forward with evidence? No.

2. Did the district court abuse its discretion in granting a motion in limine to bar several of defendants' damage claims on the basis that they were not timely or adequately disclosed? No.

3. Did the district court err in refusing to instruct the jury that fair market value could not be determined by the summation of two different valuation approaches? No need to address.

Accordingly, the district court's rulings and the jury's verdict are affirmed.

## FACTS

John Duggan is a developer, a homebuilder, and a lawyer. He is the President of Duggan Homes, Inc. (Duggan Homes), a homebuilding company, and a member of FH Investments, LLC, which is itself a member of CWD Investments, LLC (CWD). CWD was formed to develop a residential subdivision called Farmington Hills, located near 55th Street and Clare Road in Shawnee, Kansas.

Unified School District No. 232 (District) condemned 17.914 of Farmington Hills' 131.51 acres for use as an elementary school. At the time of the taking, the City of Shawnee had approved the plats, but no ground had been broken. It is undisputed that residential development is the highest and best use of the taken property. As a result of the partial taking, defendants redesigned the remainder of the subdivision.

Court-appointed appraisers valued the partial taking at $626,850. Defendants appealed the award to the district court pursuant to K.S.A. 26-508. The taking was finalized when the District paid the $626,850 into court.

### Discovery

Pursuant to a third amended scheduling order, the district court directed that all discovery, except by agreement of counsel, close on December 20, 2004. On or about April 26, 2004, defendants disclosed their three experts, including Duggan, to the District's counsel. After an assertion that Duggan was not necessarily an expert to the extent requiring a disclosure pursuant to K.S.A. 60-226(b)(6)(B), the disclosure nevertheless provided that he might be offering expert opinions:

"Defendants anticipate that Mr. Duggan will provide testimony concerning, among other things, the best and most advantageous use of the property taken by plaintiff *and damages to defendants as a result of the taking.* Thus, although Defendants are not required to make this disclosure, Defendants are disclosing Mr. Duggan at this time to the extent Mr. Duggan may be asked to offer or does offer opinions regarding the aforementioned matters." (Emphasis added.)

On September 14, 2004, defendants responded to the District's first interrogatories.

Interrogatory No. 3 asked them to "state the fair market value of the entire tract immediately before taking, the fair market value of the remainder after the taking, and the total compensation due as a result of the taking."

The part of the interrogatory response regarding defendant developer CWD basically concerned its lost profits on the sale of the 57 unimproved lots which were taken:

"Defendants state that the fair market value of the entire tract immediately before the taking as it relates to CWD Investments damages for the taking ranges from $11,394,250.00 to $12,581,100.00 based on the value of the property and the profits from the sale of 364 lots and the fair market value of the remainder after the taking as it relates to CWD Investments' damages ranges from $9,912,260.00 to $10,973,712.00 based on the value of the property and the profits from the sale of 307 lots."

The next part of the interrogatory response referred to defendant homebuilder Duggan Homes. It basically concerned damages for lost sales of homes to be built on the 57 lots:

"The fair market value of the entire tract immediately before the taking as it relates to Duggan Homes' damages ranges from $17,472,000.00 to $21,840,000.00 based on the sale of homes on 364 lots, and the fair market value of the remainder after the taking as it relates to Duggan Homes' damages ranges from $14,746,000.00 to $18,420,000.00 based on the sale of homes on 307 lots."

The final part of the response to Interrogatory No. 3 referred to both defendants and set forth the amounts of damages claimed by each:

"The total compensation due *Duggan Homes, Inc.*, ranges between $2,600,000.00 to $3,500,00.00. The total compensation due *CWD Investments, LLC* ranges between $1,400,000 to $1,700,00 based on the value of the property, the inability of *CWD Investments* to distribute development costs across the entire 364 lot subdivision as platted and approved by the City of Shawnee, and the inability of

*CWD Investments* to develop and sell 57 lots in Farmington Hills." (Emphasis added.)

Interrogatory No. 7 asked defendants to detail the facts relied upon to justify or support their damage claims. Their response concerning CWD again mentioned loss of 57 lots and loss of their ability to spread the entire subdivision's "development" costs over those lots:

"The property was purchased for development as a residential subdivision, and Plaintiff knew of Defendants' plans to develop the entire tract as a residential subdivision. The entire tract was platted as a residential subdivision, Farmington Hills, as of the taking by Plaintiff. The taking of the property in the Farmington Hills subdivision will preclude CWD Investments from developing and selling 57 lots thereby preventing CWD Investments from utilizing the property for its best and most advantageous use. The taking will also preclude CWD Investments from distributing development costs, across the entire Farmington Hills subdivision, which originally comprised 364 lots prior to the taking. These costs include to date engineering costs for redesign work, walking trails and an amenity package, the pool tract and cabana, offsite sewer costs, deceleration lanes for Claire [*sic*] Road, and costs for construction of extension of Clear Creek Parkway and an at-grade intersection at Clear Creek Parkway and K-7 required by the State of Kansas."

Defendants' response to Interrogatory No. 7 regarding factual support for Duggan Homes' damages again simply concerned its loss of ability to build homes on the taken lots:

"The taking will also preclude Duggan Homes from building and selling homes on the 57 lots thereby preventing Duggan Homes from utilizing the property for its best and most advantageous use."

Defendants expressly reserved the right to supplement their responses to Interrogatory Nos. 3 and 7.

All of defendants' interrogatory responses were signed by Duggan. In the verification, he swore that he had read them, had the authority to make them on behalf of the defendants, and that such answers were true and correct to the best of his knowledge and belief.

Several weeks after the District's receipt of these responses, on October 1, and then on November 2, 2004, Duggan was deposed as an authorized representative of both defendants, apparently pursuant to K.S.A. 60-230(b)(5). Consistent with the defendants' ear-

lier designation of Duggan as an expert, he testified he anticipated offering expert witness testimony in the case, *e.g.*, "to render opinions based upon the development in question and how we were going to proceed forward and make a profit on that." On the defendants' behalf, he now identified four specific categories of claimed damages.

First, Duggan identified lost profits on the 57 taken lots totaling approximately $1,054,500. He calculated each lot would have earned a profit of between $12,000 and $20,000, depending on its location. He calculated the figures by multiplying his estimate of the selling price for the fully developed lots (an average of $65,000—$75,000) by the historical profit margin he had obtained in his other developments: 25%—37.5%.

Second, Duggan testified that after reconfiguring the subdivision due to the taking, 10 of the remaining lots would "back up" to the new school. Because he opined that these were therefore less desirable, he devalued them at approximately $35,000 apiece for a loss of $350,000.

Third, Duggan testified that the inability to spread the original 364-lot subdivision's $900,000 "amenity costs" over the 57 taken lots would result in damages because "the profitability of the remaining lots goes down."

"And so we still have the expenses of building the amenities; but now we don't have an extra 57 lots over which to share that expense; and so the profitability of the remaining lots goes down by that number, and we think that number is somewhere between four and eight thousand dollars per unit, that we're now incurring on top of the costs we would have incurred anyway, because we're 57 lots short."

Duggan broke down the $900,000 in amenity costs as follows: $400,000 for monuments, walking trails, and water features; $350,000 for a swimming pool and its facilities; and $150,000 for other amenities ("wrought iron fences, some streets and sewer extensions to the community"). As a result, he calculated losing approximately $500 per lot on the remaining lots, so "[i]t looks like it's about $155,000 in lost profitability that we have, because we don't have [all] the lots to spread it [$900,000] out over."

Duggan identified the fourth and last category as legal and engineering costs incurred for reconfiguring the plats. He estimated these damages as between $40,000 and $70,000.

After Duggan had identified these four categories of damages being claimed by the defendants, he was asked, "Okay. Any other alleged damages?" He responded, "I'm not really sure at this time that I could think of any others." The District's counsel added together the monetary amounts Duggan provided for the four categories. Duggan then admitted that their total—$1,629,500—was the defendants' "maximum" amount of damages being claimed.

Duggan was also asked to identify the major factors that influence his profits. He testified:

"General economic conditions: Is the housing market in good shape or bad shape. Competition: What are the prices that your competitors are at on their lot price, comparing their lots to your lots. Do they have trees, and do they have walk-out lots, or things like that. So your general competition in the marketplace.

"And then I think of the other things that have to do with it are the efficiencies and the way you run your business. Are you borrowing your money at prime. Do you have long-standing relationships with your vendors, so you are getting the best prices. Are you a volume consumer of their products, like street paving, and sanitary pipes, and sewer pipes, so that you know that you're getting their best prices, because all of those things can drive your competitor's prices up, if you're doing a lot of volume.

"So I would say probably those general economic conditions, what your competitors are offering, and what prices they are at, and then your efficiencies that you create, in the way you do your own business, would probably be the main criteria to affect profitability."

Upon completion of Duggan's deposition on the second day, he formally waived his right to review the entire transcript, make changes in form or substance, and sign pursuant to K.S.A. 60-230(e).

Two days later the deposition of another defense expert, Dr. Michael Kelsay, was taken. Among other things, Kelsay testified that CWD sustained $705,758 in damages due to the loss of 57 lots, and Duggan Homes would have earned $2,376,506 in profits (reduced to present value) had it built homes on them.

Within the month, the District filed a motion in limine, which was denied. It then filed a motion to reconsider, limiting its request to exclude at trial all evidence regarding defendants' lost profits on sale of homes yet to be built on the 57 taken lots.

On April 27, 2005, in addressing the motion to reconsider, the district court ruled that "profits from home sales, per se, will not be considered in determining the compensation. . . . It's a separate item of damages." The court stated, however, that it might allow such evidence to be considered "in arriving at the value of the land" if there was evidence that the lost profits "would be a driving factor in increasing the market value" of the taken real estate.

On February 10, 2006, the Friday before the jury trial was to begin on the amount of compensation owed defendants, the district court made another ruling limiting their damages. The court orally ruled that it was "limiting the parties and experts to what they said in their depositions . . . and their reports and designation." This included a particular ruling that "items of damage not *specified* in the [Duggan] deposition were not going to be presented at trial." (Emphasis added.)

*Mistrial*

During defense counsel's opening statement to the jury the following week, he announced that defendants were seeking damages (as disclosed in Duggan's deposition) for lost profits on the taken lots; for devaluation of remaining lots backed up to the school; for replatting costs; and for $114,000 (reduced from $155,000) due to the inability to spread $900,000 in amenity costs over all 364 lots.

He also asked, however, for the following: "spreadout" costs of constructing a road from Highway K-7 to the subdivision of $169,000; spreadout costs of constructing a main arterial road through the subdivision of $278,000; spreadout costs of sewer and water lines and asphalt for Clare Road of $102,000; and tax and interest costs in an undisclosed amount. Also included on his damages flip chart shown to the jury was an item identified as "Home Construction $2,168,039."

The District objected. It asked that to be consistent with the court's ruling 3 days earlier, that these categories of damages which it asserted were not stated in Duggan's deposition should be excluded from evidence. The judge first ascertained that he had made such a ruling and asked if defense counsel understood it:

> "THE COURT: Do you agree my ruling on Friday was that the defendants' damages are going to be limited to those items *discussed* by Mr. Duggan in his deposition?
>
> "[DEFENSE COUNSEL]: *Mentioned* by him, yes, sir.
>
> . . . .
>
> "THE COURT: [E]verybody agrees the starting point was that items of damage not *specified* in the deposition were not going to be presented at trial." (Emphasis added.)

However, defense counsel later basically responded that Duggan had generally mentioned damages in his deposition and it was the obligation of the District's counsel to inquire about the specific types and their corresponding particular amounts:

> "THE COURT: . . . In Duggan's deposition the $900,000 figure involving the amenities was mentioned, but none of these numbers that you have up here on the flip chart in red [*e.g.*, spreadout costs of constructing a main arterial road of $278,000], Mr. Hursch, were mentioned.
>
> "[DEFENSE COUNSEL]: That's correct. Nor was he asked about them, Your Honor, and that's the critical point."

The District also objected to the flip chart damages claim of $2,169,039 for "Home Construction" as being barred by the court's April 27, 2005, order excluding evidence of lost profits on the homes per se. Although the judge overruled the objection, it warned defense counsel, "Now, my ruling was that evidence like this was going to be admissible to the extent that it affected the value of the real estate itself. Now, unless you tie that in, you are looking at a mistrial."

The District later renewed its objection regarding lost profits on the unbuilt homes. The judge acknowledged that "it's not black and white that I ruled [in April 2005] that there was to be no mention of these figures, but I think what I did say was they are not to be brought up as potential profits per se for the purpose of compensation to be awarded to the landowner." The judge ultimately concluded that the jury would consider those "home construction" financial figures for inappropriate purposes:

"Now, it's true that Mr. Hursh [defense counsel] was very explicit to the jury that they [were] not going to be asking for damages on account of these numbers [for home construction on the flip chart.] . . .

"[But] I don't think that you can just say to the jury, 'Okay. Here is a profit figure on house construction of $13,000 or down to $10,000, and that's going to result in a total loss of profits on home construction.' And that's what its title is, 'Home Construction,' 2,263,000 reduced to present value of 2,168,000—and then expect the jury to draw any conclusion except you want them to consider those numbers.

. . . .

"I think now looking at the [April 2005] ruling and reading that transcript that my ruling was pretty direct, and I did say, 'No. That kind of evidence is not going to come in except under very limited circumstances,' and I don't think we have gotten to those very limited circumstances here.

"Now, what I did say was evidence of lost profit, potential future profits. What I said at page 30 of the transcript was to the extent that you have got a developer who has got some dreams here and to the extent that that developer can show he has a track record and show he has done this at other locations and that he had a plan at the time of taking to do these things and *to the extent that at the time of the taking those potential future profits would be a driving factor in increasing the market value and an expert is willing to say that and stake his reputation and if a jury believes it, then I think it could. It could affect the value of the lots and thus the value of the land taken and would be properly admissible.*" (Emphasis added.)

The court then granted the District's request for a mistrial, holding that defense counsel's showing the jury approximately $2.2 million for "Home Construction," *i.e.*, in lost profits on sales of homes not built at the time of the taking, was barred by its April 2005 ruling. Retrial was set for May 22, 2006, 3 months later.

*Partial summary judgment*

Two months after the mistrial, on April 20, the District filed a motion for partial summary judgment. Characterizing many of defendants' purported damages as lost profits, it first asked the court to preclude "lost profits on the sale of homes to be built on the property." It also sought preclusion of "lost profits stemming from an inability to allocate the cost of amenities to the subject property [*i.e.*, $155,000 claimed during Duggan's deposition, reduced to $114,000 at the mistrial]."

The District argued, *inter alia,* that the alleged lost profits relating to these amenity costs and to home sales were unique to these defendants and had no rational relationship to the land's fair market value. It highlighted Duggan's deposition testimony that defendants' profits depended in large part on "the efficiencies and the way [they] run [their] business," and not on the particular ground being developed. It also pointed to Duggan's deposition testimony to argue that the damages were speculative, *e.g.,* "whether the defendants' long-standing relationships with vendors will remain intact." As a further example of speculation, it questioned whether the cost of materials to be used in developing the subdivision would remain constant.

In defendants' response, they only disputed one of the District's facts, No. 11, which states: "The Defendants are also claiming as damages lost profits from Duggan's inability to build and sell homes on the subject property." In controverting this fact, defendants contended that they were not seeking lost profits on future homes as a specific item of damage, but were entitled to present "evidence of income" to arrive at fair market value. They "are entitled, as a matter of law, to present evidence to the jury concerning the potential income stream from an attribute of the property that was taken by plaintiff as a factor considered by the jury in arriving at the taken parcel's overall fair market value." In the argument section, they contended:

"Defendants will not specifically ask the jury to award damages for lost profits on home sales. This court has already ruled on that issue. But defendants are entitled to present this evidence for the jury to consider how the property's intended use could have produced an income stream; therefore, the income producing stream from the taken property is one item that could affect the overall fair market value for the property."

As for the purported lost profits stemming from an inability to spread the cost of amenities, the defendants, in their additional statement of fact No. 3, stated, in relevant part:

"These [*e.g.,* 'the additional costs for unallocated development amenities in the amount of $114,000'] are additional costs and expenses directly attributable to Plaintiff's taking and as such are relevant considerations to the determination of fair market value that the jury will make at trial. See Defendants' Supplemental

Answers to Plaintiff's First Interrogatories to CWD Investments, LLC and Duggan Homes, Inc., attached as Exhibit F."

Defendants explained:

"Because defendants cannot allocate the amenity costs [*e.g.*, $900,000] over a wider number of lots, this fact directly impacts the remaining property. For example, if defendants allocate the amenity costs to the remaining lots that are not taken, then the price for lots becomes exorbitantly high, which affects their ability to sell the remaining lots and affects the value of the remaining property. As such, defendants are not specifically seeking lost profits as a specific item of compensable damage. But defendants' inability to allocate the subdivision's amenity costs to all of the lots taken directly impacts and is certainly tied to the market value of the remaining property. [Citation omitted.] It is a factor that may be considered by the jury in arriving at the overall market value."

Defendants attached, among other things, a three-page affidavit from Duggan. It related to a subject not at issue on the appeal of the summary judgment: alternative types of access to the subdivision, *e.g.*, from Highway K-7, and their estimated costs.

Among other things, the District's reply reiterated that the defendants' claimed damages relating to "amenity costs" were nothing more than lost profits that had no rational relationship to fair market value. It claimed, once again, these amenity costs ($900,000), as well as other lost profits, were unique to Duggan and related solely to how he chose to lay out his subdivision on this raw land:

"A willing buyer might not lay out the subdivision in the same way that Mr. Duggan did, might have different vendor relationships that impact its profitability, or for other reasons, might be able to avoid the alleged lost profits that were unique to Mr. Duggan. It is this very uncertainty that has led the Supreme Court to prohibit the use of lost profits to measure the value of property taken by eminent domain. *City of Bonner Springs v. Coleman*, 206 Kan. 689, 694-95, 481 P.2d 950 (1971)."

The District again argued that defendants had come forward with no evidence showing that the lost profits are linked to fair market value of the property. It further contended:

"It is not enough for them to make the self-serving argument that the lost profits 'directly affect the remaining property tract not taken.' More is required, and it is simply too late in the game for defendants to attempt to offer any expert opinions to establish a connection to fair market value."

On May 22, after the retrial scheduled for that day had been postponed, the trial judge heard arguments and ultimately granted the District's motion for partial summary judgment. It characterized the stricken claims as lost profits for which defendants had shown no linkage to fair market value.

"Now, the [*City of Bonner Springs v.*] *Coleman* case makes a succinct, accurate statement, 'What one man might do at a profit, another might do at a loss.' . . . *I'm still looking for that connection . . . between all of those development expenses and the value of the land to a ready, willing, and able buyer in a free market transaction.*

. . . .

"I'm going to sustain the motion for partial summary judgment, and I'm going to preclude the defendants from claiming as damages [1] lost profits stemming from an inability to allocate the costs of amenities to the subject property and [2] lost profits on the sale of homes to be built on the property. I think those are separate items, probably capable of accurate calculations the defendants have done, *but I don't think the connection between those accurate costs and the value of the land has been made to the Court's satisfaction, and to the extent I have searched the record, I can't find that connection.*

"*And I think on that basis, in the absence of such evidence, the relationship between those lost profits and the value of the land has not been established, and so the lost profits may or may not exist.* But I think that the ruling of the supreme court in the *Coleman* case precludes the award of damages based on the profit of a business.

"The [*Coleman*] Court said that, 'The profits of a business are too uncertain and depend on too many contingencies to be accepted as any evidence of the usable value of the property upon which the business is carried on.'

. . . .

"And it seems to me that the principle of law as announced by the supreme court in *Coleman* is a sound one, and that *absent the evidence linking the lost profits to the value of the land, it would be prejudicial to the plaintiff and confusing to the jury to allow the defendants to go into these items of lost profits.*" (Emphasis added.)

During discussion on defendants' later request in the hearing for an interlocutory appeal, they argued that providing evidence of linkage in response to the motion for partial summary judgment was not yet their obligation.

"In order . . . to support a motion for summary judgment, they [District] would have to set forth a statement of uncontroverted fact if there is no evidence tying in these costs to the value of the property remaining. See, they didn't do that, Judge. *Consequently, we weren't in a position where we can controvert that*

*statement.* Had they done so, we would have very simply submitted an affidavit of an expert in the law and fact, Mr. John Duggan, to explain that's the effect it would have had on the remainder. *We think the court has granted a summary judgment when we didn't have an opportunity to controvert the fact which the Court has just concluded.*" (Emphasis added.)

The defendants later reiterated their argument that providing linkage evidence was not yet their obligation:

"*So the record is clear, Your Honor, had a statement of uncontroverted fact been presented to us for controversion, we would have controverted that statement of fact.* It would have been controverted with two arguments. Number one, an affidavit from John Duggan who as an expert, an owner of the property, and an expert in fact as well, who would have said, 'No. Any informed buyer of the remaining portion of this property would deduct from its value the costs of amenities that we have included herein and everything else that was included in the statement of uncontroverted fact.' It would have another paragraph along the lines of, 'We believe that any jury would have reached the same conclusion.'" (Emphasis added.)

To remedy the problem, defendants then offered to have Duggan testify to this effect at the summary judgment hearing.

The District responded that it had already fulfilled its obligation by pointing out the lack of the defendants' evidence and that it was now their obligation to proceed:

"Your Honor, the defendant [*sic*: District] does not have to present evidence to show the lack of evidence. The defendant [*sic*: District] can simply point the Court to the fact in the motion that there is no evidence to support a critical element of the plaintiff's [*sic*: defendants'] claim. It is then incumbent upon the party opposing summary judgment to present evidence to the court to overcome that argument."

The court rejected the defendants' position and affirmed the grant of partial summary judgment. It reexamined the District's uncontroverted facts and again characterized the stricken claims as lost profits for which defendants had shown no linkage to fair market value. The judge also held the claims went more instead to the efficiencies of these particular defendants and how they ran their business.

"Now, the fact of the matter is that the statement of uncontroverted facts, as set forth by the plaintiff, cites, I think, the controlling factors here and establish and support the argument that's ultimately made that the lost profits the defen-

dants claimed to have suffered as a result of their inability to build homes on and assign amenities costs to the subject property *have no relationship to the value*. I think that the statement of uncontroverted facts, most specifically Statement Nos. 7, 8, 9, and 10, support the statement and the argument.

"Now, 7, 8, 9 and 10 are all noted by the defendants as uncontroverted, although No. 7 it says is uncontroverted but immaterial and then sets out lengthy reasons why they disagree about Statement No. 7. Statements Nos. 8, 9, and 10 the defendants state are uncontroverted.

"Now, what I glean from those findings of fact, that I make based upon the plaintiff's statement of uncontroverted facts, are the essence of the ruling that I have made that the evidence *establishes no connection between the profit to be created from the development of this tract of ground and the fair market value*.

"To the contrary, I think the statement of uncontroverted facts establishes that the *profitability issue is one that relates to the efficiencies of the defendants' business and the way the defendants run their business*.

"And, accordingly, I think that the uncontroverted facts in this case justify the finding that the Court has made that there's no genuine issue as to a material fact here, and the Court has and does sustain the motion for summary judgment on that basis." (Emphasis added.)

Defendants filed a motion to reconsider, attaching a 34-page affidavit from Duggan. In 2 of its 115 paragraphs, it purported to provide the alleged evidentiary linkage between Duggan's lost business profits, *i.e.*, through unbuilt homes and distribution of amenity costs, and the fair market value of the land. The motion was denied.

*Supplementation of interrogatory responses and subsequent motion in limine*

On April 21, 2006, the day after the District had filed its motion for partial summary judgment and 1 month before the scheduled retrial, defendants had filed supplemental answers to the District's interrogatories. The original answers had been supplied 19 months earlier in September 2004. Defendants now detailed their alleged damages in response to Interrogatory No. 3. They reiterated "original categories" of damages from Duggan's 2004 deposition, *e.g.*, replatting costs.

But, perhaps concerned about the District's objection to their allegedly added damages at the mistrial 2 months earlier, they also now presented those particular damages first specifically mentioned there: spreadout costs of sewer and water lines and asphalt for Clare Road of $102,000 and spreadout costs of constructing a

main arterial road of $278,000. They also increased a particular damage amount specifically mentioned for the first time at mistrial: the cost to construct a road (Clear Creek Parkway) from K-7 to the subdivision now jumped from $169,000 to $1,455,960. Finally, they now assigned amounts to categories of damages first claimed, but unvalued, at the mistrial: interest of $621,000 and taxes of $20,000.

The District quickly responded with another motion in limine. Consistent with its understanding of the court's order the Friday before the mistrial and with its objection (raised but not ruled upon) at the mistrial, it asked that certain damages evidence be excluded. Specifically, it wanted defendants to be prohibited from "mentioning, offering, or introducing evidence concerning specific items of damage that neither John Duggan nor any of Defendants' experts identified or quantified in reports or depositions." Concurrent with its motion in limine was a related motion to strike defendants' supplemental responses to the interrogatories setting forth these "new" damages.

The District acknowledged that Duggan had identified and quantified certain alleged damages in his deposition, *i.e.*, the four specific categories and the values asserted for each. It argued, however, that while other damages may have been vaguely mentioned, they were not specifically discussed or quantified during Duggan's deposition or in defendants' initial responses to interrogatories. For example, the District recognized that "offsite sewer costs" had been mentioned in the initial interrogatory responses. It claimed, however, that it had been led to believe that this factor was included in the $155,000—now $114,000—for amenities cost distribution identified in Duggan's deposition (which included "sewer extensions to the community"). Accordingly, sewer costs could not be in the separate category now asserted for an additional $102,000.

Overall, the District sought to exclude evidence regarding defendants' lost profits caused by an inability to spread out the cost of sewer work, street improvements, a road to the development, water, asphalt, taxes, and interest. The District contended that if these damages were allowed, the case would have to be delayed

even further because significant additional discovery would be required, including the District's retention of additional expert witnesses, particularly on the engineering issues.

Defendants replied that they had simply supplemented their answers to the District's interrogatories and that they could not be faulted for the District's failure to ask pointed questions during Duggan's deposition. Additionally, they argued that all such evidence went to the fair market value of the land and therefore should be presented to the jury. Defendants claimed that the appropriate solution was for the District to "vigorously cross-examine" their expert witnesses.

During the same May 22 hearing that the court granted the District's motion for partial summary judgment for lack of evidence connecting lost profits to fair market value, it also fully granted the District's latest motion in limine. It found that these alleged damages either were not timely, or adequately, disclosed—or both. Accordingly, the court not only prohibited damages for categories that had not been previously identified, but also prohibited damages that had not been quantified for the previously mentioned categories. The judge held it would be unfair to the District to allow defendants to make these particular claims at this late date:

"Now, the itemization of a million and a half dollars for the Clear Creek [Parkway] extension appears to me to be an item of damage that was not previously disclosed by neither Mr. Duggan nor any of the experts identified pursuant to the scheduling order in this case.

"Now, to [also] allow the defendants at this late date to quantify items of damages for the first time seems inherently unfair to me, and I'm especially concerned if what we are talking about is an [engineering] expert's opinion as to the probable costs of doing this [e.g., Parkway extension] work.

"The fact that the author of that opinion [engineer] is someone who is undoubtedly a specialist in the field would likely carry significant weight with a jury, and I think it would be unfair to permit the defendant at this hour, literally at the eleventh hour, to come in and go down the road of an undisclosed expert's opinion, and so I'm going to sustain the motion in limine as to the engineer's report.

"Now, in similar fashion, I think what Mr. Duggan was asked [during his deposition], the question is: Are there any other items of damage? He had an obligation to answer that question candidly and truthfully. Now, he said, as I understand it, his answer was, 'No. None that I can think of at this time.'

"Well, it seems to the Court that you just don't have an oversight as to a $1.5 million item of damages [cost to construct Clear Creek Parkway] in a case like this, and so to the extent the defendant limited itself to show items of damages spelled out in Mr. Duggan's deposition, then defendant should be bound by those items of damages.

. . . .

"[T]o the extent that there's new material that's been generated since the first trial of this matter, I don't think that it's fundamentally fair to permit the defendants to introduce such at this late date. There has to be a conclusion of trial preparation at some point."

Similar to the court's damage-limiting ruling the Friday before the mistrial 3 months earlier, the court now ordered that

"the defendants are prohibited from mentioning, offering, or introducing evidence concerning specific items of damage neither Mr. Duggan nor any of defendants' other experts have identified in their reports or depositions."

Consequently, the court also granted the District's related motion to strike defendants' interrogatory supplementation.

At the second trial, the District argued that defendants were entitled to no more than $710,000 as just compensation. It relied upon the testimony of Bernie Shaner, a licensed real estate appraiser.

Limited by the trial court's previous rulings on damages, defendants' witnesses detailed their losses as follows: the cost of the property actually taken ($409,386); lost profits on the property actually taken ($643,521) (without consideration of home sales profits); school proximity damages to the remainder ($315,000); and expenses to redesign the subdivision ($30,000).

The jury found that the fair market value of the property was $718,100.

Additional facts will be added as necessary to the analysis.

## ANALYSIS

Basically, defendants complain of two different district court rulings that each eliminated several of their damage claims 3 months after the mistrial. They complain about the jury verdict only to the extent these rulings excluded additional evidence of damages for the jury's consideration. As discussed below, each ruling carries its

own standard of review. Each ostensibly concerns the value of the partial taking of the land as defined in K.S.A. 26-513(c).

"If only a part of a tract of land or interest is taken, the compensation and measure of damages is the difference between the fair market value of the entire property or interest immediately before the taking, and the value of that portion of the tract or interest remaining immediately after the taking."

And fair market value itself is defined as "the amount . . . of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." K.S.A. 26-513(e).

Issue 1: *The district court did not err in granting partial summary judgment to bar several of defendants' damage claims for their failure to come forward with evidence.*

We have held that "[c]onsiderable discretion is vested in the trial court in admitting or rejecting evidence of value" in eminent domain proceedings. *City of Wichita v. Eisenring*, 269 Kan. 767, 773, 7 P.3d 1248 (2000). Here, the district court acknowledged the general rule in Kansas prohibiting recovery for lost profits in such proceedings. See *City of Bonner Springs v. Coleman*, 206 Kan. 689, 694-95, 481 P.2d 950 (1971) ("The profits of a business are too uncertain, and depend on too many contingencies safely to be accepted as any evidence of the usable value of the property upon which the business is carried on."). In April 2005, however, it ruled that to the extent lost home sale profits were linked by an expert to fair market value, such evidence could be offered on that limited issue.

One year later, the trial court held that defendants failed to present any evidence that linked the claimed loss of profits, both for the sale of future homes and the inability to spread out amenity costs, to fair market value. In granting partial summary judgment against defendants, the court also determined that the profits went more instead to the unique way that these particular defendants conducted their business.

Defendants now renew their arguments made to the district court. They contend that evidence of their inability to spread out

costs and of their lost home sales profits is relevant to establish fair market value under the capitalization of income approach stated in K.S.A. 26-513(e). Accordingly, they assert that the "income stream from an attribute of the property taken" should be put to the jury. They again argue that the District failed to show the trial court that there was no relationship between the fair market value of the remaining property and the lost profits.

The District primarily responds that there was no evidence in the record that these lost profits actually impacted the fair market value and that defendants bear the burden of establishing the link.

Neither party challenges the trial court's April 2005 ruling requiring linkage between these alleged lost profits and fair market value.

*Standard of Review*

An appellate court applies the same summary judgment rules as the district court. *Warner v. Stover*, 283 Kan. 453, Syl. ¶ 3, 153 P.3d 1245 (2007). Some of those rules are as follows:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought." *Warner*, 283 Kan. 453, Syl. ¶ 1.

More important to this case, we agree with the United States Supreme Court that the burden is not on

"the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, . . . *the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.*" (Emphasis added.) *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

See also *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) ("[M]ovant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.").

Once the movant has discharged this initial burden, "[t]he party opposing summary judgment . . . has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case." *Hurlbut v. Conoco*, 253 Kan. 515, 520, 856 P.2d 1313 (1993). See *Thom*, 353 F.3d at 851. It is not for the court to seek out, but for counsel to designate in the response, the facts that support a party's position. See *Slaymaker v. Westgate State Bank*, 241 Kan. 525, Syl. ¶ 1, 739 P.2d 444 (1987).

These particular rules are consistent with one of the principal purposes of the summary judgment rule itself: " 'to isolate and dispose of factually unsupported claims.' " *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). Accordingly, these rules also apply in an eminent domain appeal under K.S.A. 26-508 where neither party bears the burden of proof on the issue of damages.

We have thoroughly reviewed the summary judgment response filed by defendants. Our review confirms the District's assertion, and the district court's holding, that the response contains "an absence of evidence to support" these damage claims. *Celotex Corp.*, 477 U.S. at 325. Indeed, defendants virtually admitted to the trial court that their response contained no facts linking the claimed loss of profits, based on both the sale of future homes and the inability to spread out amenity costs, to the property's fair market value. They apparently made no timely effort to show the evidentiary link, a failure that is attributable to their belief at the trial court and on appeal that the burden was the District's, as the moving party, to *show* absence of linkage, and not theirs, as the nonmoving party, to show its presence.

Specifically, on appeal defendants again essentially assert that the District was required to set forth a statement of uncontroverted fact asserting there was no evidence linking the profits to the value of the property remaining before they were required to controvert that statement with their facts, *e.g.*, via a Duggan affidavit. Consistent with this assertion, they argue that the District "provided no admission from defendants or affidavit from an expert to substantiate this bald proclamation," *i.e.*, the lack of linkage. Defendants' view of the nature and extent of the District's burden is

directly contrary to the holding in *Celotex Corp.*, 477 U.S. at 325. See also *Thom*, 353 F.3d at 851 (explaining the respective obligations of the moving and nonmoving parties).

Defendants also appear to assert that despite the District's purported failure to meet its burden, they nonetheless presented sufficient evidence to avoid the entry of summary judgment. We disagree. Our review of their response discloses that the closest they come to meeting their burden is to make general allegations and arguments.

We observe at the outset that Defendants' response to the only fact contained in the District's motion that they controverted, No. 11, is a general allegation. As mentioned, that fact states: "The defendants are also claiming as damages lost profits from Duggan's inability to build and sell homes on the subject property."

The defendants' response to this fact made no reference to any evidence in the record, but instead contended:

"11. Controverted. Defendants are not specifically seeking the profits that were lost because they can no longer build and sell homes on the taken property. But defendants are entitled, as a matter of law, *to present evidence to the jury concerning the potential income stream from an attribute of the property that was taken by plaintiff as a factor considered by the jury in arriving at the taken parcel's overall fair market value.* See, e.g., *Creason v. The United Government of Wyandotte County*, 272 Kan. 482, 490, 33 P.3d 850 (2001)." (Emphasis added.)

Indeed, defendants were well aware from the April 2005 ruling, and as recently as the mistrial, that some connective evidence of this specific nature would be required of them. The trial transcript provides:

"THE COURT: [W]hy did you put the 2.3 million and 2.2 million figures up there [home construction on the flip chart]?

"[DEFENSE COUNSEL]: Because those are the figures that the expert has calculated that is generated from those sales. That's Dr. Kelsay, Your Honor. That's not Lynn Hursh. That's the expert.

"THE COURT: And Dr. Kelsay is going to testify that those figures affect the value of the land to *what* extent?

"[DEFENSE COUNSEL]: *To some extent.*

"[PLAINTIFF'S COUNSEL]: Your Honor, that's not in Dr. Kelsay's report at all. He never mentioned that in his deposition. He is an economist, not a real estate expert." (Emphasis added.)

Rather than presenting evidence of this connection to the court in defendants' summary judgment response, they only made similar, general allegations. For example, in the argument section they contended:

"Defendants will not specifically ask the jury to award damages for lost profits on home sales . . . . But defendants are entitled to present this evidence for the jury to consider how the property's intended use could have produced an income stream; therefore, the income producing stream from the taken property is one item that could affect the overall fair market value for the property."

Defendants point out they provided their additional Fact No. 3, as previously set forth verbatim in the opinion, to generally assert that the $114,000 for unallocated amenities "were additional costs directly attributable to the [District's] taking" and were therefore relevant to the fair market value determination the jury would make at trial. As record evidence they attached all their supplemental interrogatory responses, again sworn to and signed by Duggan as defendants' representative.

The District points out, as more fully discussed in Issue 2, that the district court struck the responses as untimely because their information was not contained in Duggan's deposition, a decision we affirm as within its discretion. The District is not entirely correct. Although the defendants do not raise this assertion, the supplemental responses' references to the $114,000 in amenity costs apparently were not barred because Duggan identified this category and provided an amount in his deposition. Nevertheless, we do observe that defendants make no effort to specify which of the supplemental responses support their position, or how. See Supreme Court Rule 141(b) (2008 Kan. Ct. R. Annot. 222) (the response shall contain "any additional genuine issues of material fact which preclude summary judgment . . . with precise references to pages, lines and/or paragraphs of transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents contained in the court file and otherwise included in the

record"). This court will not speculate or attempt to perform this function for them. See *Slaymaker,* 241 Kan. 525, Syl. 1.

In sum, defendants are left with their arguments, not facts, concerning an inability to spread the cost of $900,000 in amenities over 57 fewer lots. We note, as one example, that defendants only generally assert that the inability "directly impacts and is certainly tied to the market value of the remaining property. [Citation omitted.] It is a factor that may be considered by the jury in arriving at the overall market value." Similarly, they only assert: "Because defendants cannot allocate the amenity costs over a wider number of lots, this fact directly impacts the remaining property."

We acknowledge that Defendants also provided additional statement of Fact No. 4 which stated:

"4. On September 13, 2004, Defendants identified to plaintiff all the elements of their damages in Defendants' Responses to Plaintiff's First Interrogatories to defendants CWD Investments, LLC and Duggan Homes, Inc. Specifically, Defendants answered Interrogatory Nos. 3 and 7 by identifying the amount of monetary damages they seek and by listing the very same reasons for their damages that plaintiff now complains were never disclosed. See Exhibit G."

These answers to Interrogatory Nos. 3 and 7, set forth earlier in the opinion, clearly provide no linkage. They merely make allegations of damages.

In short, it is not sufficient merely to argue in a summary judgment response that the fair market value would be "impacted by," or "affected by," or "tied to" these lost profits on unbuilt homes and due to unspread amenity costs. Nor is it sufficient to respond to the motion by claiming that such evidence will be provided at trial, as defendants appear to suggest, *i.e.,* "defendants are entitled . . . to present evidence to the jury concerning the potential income stream." See *Essmiller v. Southwestern Bell Tel. Co.,* 215 Kan. 74, 77, 524 P.2d 767 (1974). Rather, once the District pointed out in its summary judgment motion per *Celotex* that no evidence existed, defendants were required to present some specific evidence in their response supporting their claim, *e.g.,* showing linkage. See *Hurlbut v. Conoco Inc.,* 253 Kan. 515, 856 P.2d 1313 (1993). It is not the obligation of the trial court to search the record for such evidence. See *Slaymaker,* 241 Kan. 525, Syl. 1.

Just as important, we agree with the district court that these lost profits go more to the unique business practices and efficiencies of these particular defendants. We acknowledge the parties agree that residential development is the highest and best use of the property. Nevertheless, we perceive that many "well informed buyers" in that particular field could approach development of this land differently in their pursuit of profits. See K.S.A. 26-513(e). We recognize, for example, that not every developer of this amount of acreage would agree with Duggan's numbers and sizes of lots or houses. Nor would every developer, or even most developers, spend $350,000 on a swimming pool and attendant facilities and another $400,000 on monuments, walking trails, and water features.

As mentioned, defendants filed a motion to reconsider the partial summary judgment. They attached a 115-paragraph, 34-page affidavit from Duggan, apparently in an effort to supply the evidentiary linkage that they failed to provide in their response. Such an affidavit was too late for consideration on the summary judgment motion. See *Hurlbut,* 253 Kan. at 520 (party opposing summary judgment has affirmative duty to come forward with facts to support its claim).

The motion for reconsideration based upon that affidavit was therefore properly denied by the trial court. In *Bacon v. Mercy Hospital of Ft. Scott,* 243 Kan. 303, 314, 756 P. 2d 416 (1988), we held that the trial court properly refused to consider affidavits attached to a motion to alter or amend a summary judgment previously entered. We stated: "A party may not remain silent in the face of a motion for summary judgment and later claim there is additional evidence to support its claims." 243 Kan. at 314. The same rationale applies to the defendants' attempts to defeat summary judgment by offering to have Duggan testify at the hearing on the motion and to their reference on appeal—for the first time—to the mistrial testimony of witness Denis Johnson.

The motion for partial summary judgment was properly granted.

Issue 2: *The district court did not abuse its discretion in granting a motion in limine to bar several of defendants' damage claims on the basis that they were not timely or adequately disclosed.*

The district court granted the District's motion in limine and motion to strike the supplemental interrogatory responses submitted 5 days prior. It prohibited, as untimely and prejudicial to the District, evidence of defendants' inability to spread out the costs of street improvements, sewer work, a road to the subdivision (Clear Creek Parkway extension), water, asphalt for roads, taxes, and interest.

Defendants generally renew their arguments to the district court, contending that the court erred because this evidence was relevant to factors listed in K.S.A. 26-513(d). They assert that the District cannot claim unfair surprise because it was aware of the evidence they sought to present. Defendants also blame the District for failing to ask specific enough questions in Duggan's deposition. Finally, they argue that precluding Duggan from testifying was erroneous as a matter of law because he was a representative of the owner of the property taken and because the District opened the door to testimony concerning the Clear Creek Parkway extension.

The District responds that K.S.A. 60-445 gives trial courts broad discretion to exclude even otherwise admissible evidence, and that the district court properly exercised its discretion here. It also argues that it should not be required to infer defendants' alleged damages from the thousands of documents provided during discovery. Finally, the District contends that it did not "open the door."

We believe that much of this issue is resolved by the analogous case of *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, Syl. ¶ 6, 915 P.2d 86 (1996). There, Olathe, a manufacturer of tub grinders, sued Browning, a manufacturer of bearings which purportedly caused malfunctions in the tub grinders. Among Olathe's damage claims at trial was one for lost profits of $4.3 million on its 10-foot tub grinder due to damaged reputation.

After a mistrial was declared, the trial court established a number of deadlines before retrial on June 27. Among these were an April 15 deadline for supplementing responses concerning any changes in subject matter, facts, and opinions to which any expert was expected to testify. In March, Olathe and its experts apparently

changed its lost profits theory from a "10-foot tub grinder/damaged reputation" theory to a "12-foot tub grinder/delayed development" theory, and now sought over $8 million in damages.

However, when Olathe served Browning with its expert witness supplementations on the April 15 deadline, no mention was made of the new lost profits theory. Five days later Browning asked for supplemental interrogatory answers regarding expert witnesses. On April 25, Olathe responded, notifying Browning for the first time of its new lost profit theory and that its expert "might offer testimony to support a damages claim" involving both grinders. *Olathe*, 259 Kan. at 760. When on May 18, Olathe supplied its revised damage calculations to Browning, however, it did not designate any damages as attributable to the new theory.

On May 23 and 24—within the court's deadline for deposing the experts on their supplemental responses—Browning deposed Olathe's experts for the second time. After learning that Olathe had replaced the original lost profit theory with the new one, it obtained details on the latter theory's damages. Olathe's expert admitted that the "theories kind of switched themselves" the previous March.

On June 21, 6 days before trial, Browning filed a motion in limine to exclude the new theory, which the trial judge granted. He later affirmed his exclusion, additionally relying upon a determination that Olathe's disclosure of its new theory was late and had thereby prejudiced Browning.

" 'I do find in the alternative that the claim did come in extremely late, put the defense in an unfair position to have to rebut a substantial new claim at the eleventh hour of this case, and, based on the extensive pretrial discovery that had taken place, I felt it was unfair at the lateness of the hour to subject the defense to this additional claim.' " *Olathe*, 259 Kan. at 762.

This court upheld the district court's ruling. It first observed that trial courts are "vested with broad discretion in supervising the course and scope of discovery." *Olathe*, 259 Kan. at 768. This court further observed, among other things, that Olathe may have been aware of this new lost profits theory for several months before deciding to disclose it to Browning; the new theory altered Olathe's own experts' ultimate opinions as to the amount of lost profits which it suffered; and the new theory was not premised on any

new information provided by a Browning expert, thus totally surprising Browning and making Browning unprepared to defend against it. *Olathe*, 259 Kan. at 771.

The *Olathe* court also cited K.S.A. 60-445 as described in *Hurlbut v. Conoco Inc.*, 253 Kan. 515, 534, 856 P.2d 1313 (1993):

"Under K.S.A.60-[445], the trial judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

See *Olathe*, 259 Kan. at 771.

This court held that the trial court did not abuse its discretion when it apparently determined that "the probative value of the new lost profit theory did not outweigh the risk that its admission would unfairly and harmfully surprise Browning." *Olathe*, 259 Kan. at 771-72.

The *Olathe* court further agreed that Browning was prejudiced by the "11th hour lost profit theory." 259 Kan. at 772-73. Because of the late disclosure, Browning did not have the opportunity to discover certain information. Citing *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 11-13, 815 P.2d 528 (1991), the court observed that "the purpose of discovery is to eliminate the element of surprise from trials and to simplify issues by fully disclosing the evidence regarding the issues." *Olathe*, 259 Kan. at 773. As a result, the *Olathe* court held that the late disclosure of the new lost profits theory and supporting evidence was "opposed to the purpose of discovery and was thus properly excluded . . . as unfairly prejudicial." 259 Kan. at 773.

Here, Duggan's original sworn responses to interrogatories on behalf of defendants admittedly did reference unquantified costs of "engineering . . . for redesign work, walking trails and an amenity package, pool tract and cabana, offsite sewer costs, deceleration lanes for Claire [*sic*] Road, and costs for construction of extension of Clear Creek Parkway and an at-grade intersection at Clear Creek Parkway and K-7 required by the State of Kansas."

When Duggan testified in his deposition several weeks later, however, as a designated representative of the defendants and as

one of their experts, he limited the claims to only four specific categories of damages: (1) lost profits on the condemned lots; (2) devaluation of the remaining lots because of the location of the school; (3) the inability to spread out over the condemned lots certain amenity costs, including "some street and sewer extensions"; and (4) costs incurred from replatting.

When Duggan was asked about any other damages, he replied he was not sure that he could think of any others at that time. Further, he agreed that the maximum compensation sought would be $1,629,500, the total of the values he provided for the four specified categories. Because Duggan is also a lawyer, and actually deposed a District expert witness in this case, it can certainly be said that his waiver—of his right to review his deposition transcript, make changes in form and substance, and sign under K.S.A. 60-230(e)—was made with an awareness of the possible consequences.

This waiver demonstrates an expression of his intention to absolutely stand by this unmodified testimony as a representative of the defendants. Because he additionally was the defense representative signing the original interrogatory responses under oath, his deliberate waiver can also be reasonably interpreted as a decision to use his specific, damage-limiting deposition testimony to displace the earlier, more general interrogatory responses. For example, the earlier "offsite sewer costs" would be contained in the later deposition "sewer extensions," which would in turn bar the later supplemental interrogatory response claims of spread out costs of sewer and water lines of $102,000. The District argues, and the transcript reveals, that the District intended to identify, and pin down, all defendants' damages categories and corresponding amounts at the deposition of their designated representative and expert witness.

Consistent with the District's intent, the Friday before the mistrial the district court ruled that items of damage not specified in Duggan's deposition were not going to be presented at trial. Consequently, it appears that the District not only intended to identify, and pin down, the damages categories and amounts at Duggan's deposition, but that it also intended to keep these limitations nailed

down with the pretrial ruling. The District's reliance upon the Duggan deposition for these purposes is typical, as we have noted:

"The taking of pretrial depositions is part of the discovery process authorized by K.S.A. 60-226, and among the purposes to be served thereby is ascertaining what an adversary witness may know about matters in litigation and *what his probable testimony will be, to the end that the element of surprise will be eliminated so far as possible.*" (Emphasis added.) *Hagedorn v. Stormont-Vail Regional Med. Center,* 238 Kan. 691, Syl. ¶ 3, 715 P.2d 2 (1986).

Apparently for these same reasons, 3 days later at trial the District objected to the defendants' references to damage categories and amounts that it asserted were not contained in Duggan's deposition. The court's pretrial ruling was essentially restated at the later hearing on the mistrial.

In defendants' supplemental interrogatory responses submitted 2 months later in April 2006—more than 1 year after Duggan's deposition and the deadline for ending discovery, and 1 month before the retrial—they additionally claimed it would cost $1,455,960 to extend Clear Creek Parkway, $278,000 for the collector street, $102,000 for sewer, water, and Clare Road asphalt allocation, $621,000 in additional interest, and $20,000 in taxes. Accordingly, the instant case bears similarity to *Olathe Mfg., Inc.,* 259 Kan. 735. There, the court noted that Olathe may have been aware of its new theory for several months before deciding to disclose it to Browning through discovery responses. Here, these damages—because they were mentioned at the mistrial—were obviously known to defendants months before being formally presented to the District through discovery responses.

While some of these items were generally mentioned in Duggan's deposition and in the original responses to interrogatories, most were not. And certainly the defendants did not officially inform the District through discovery channels of the *cost* of this particular work until the interrogatory supplementation 4 weeks before the scheduled retrial. Particularly when in the defendants' original interrogatory responses they expressly reserved the right to supplement their responses to Interrogatory Nos. 3 and 7, the District would be justified in believing such supplementation, if

any, would be provided earlier. We observe that under K.S.A. 60-226(e)(2):

"A party is under a duty *seasonably to amend* a prior response to an interrogatory, . . . if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." (Emphasis added.)

Supplementing 1 year after discovery ended, and 19 months after the original interrogatory responses, is not "seasonable" supplementation, particularly when these same damages had been asserted at the mistrial 2 months earlier.

The District again argues that allowing these damages would have required trial delay because they would have required significant additional discovery, including its retention of additional expert witnesses on the engineering issues. In this regard, the instant case bears additional similarity to *Olathe Mfg. Inc.* where, because the new claims were not premised on any new information provided by Browning, Browning was unprepared to adequately address Olathe's new damage claims.

Although not mentioned in *Olathe Mfg. Inc.*, the following decision from this court provides further guidance on these issues:

"It is an elementary principle of law that the purpose of discovery rules is to . . . educate the parties in advance of trial of the real value of the claims and defenses; to expedite litigation; to safeguard against surprise; to prevent delay; to simplify and narrow the issues; and to expedite and facilitate both preparation and trial. [Citation omitted.]" *Vickers v. City of Kansas City*, 216 Kan. 84, 90, 531 P.2d 113 (1975).

Given the purposes of the discovery process, *e.g.*, to educate in advance of trial on the real value of claims and to safeguard against surprise, and given the district court's broad discretion in discovery and in evidentiary admission pursuant to K.S.A. 60-445, we cannot say that the court's ruling was an abuse of discretion. Even though defendants eventually disclosed this information, the district court may exclude evidence that was not timely, or adequately, disclosed—or both. As the district court pointed out, defendants should not be able to continually increase the amount of damages claimed until trial. Nor, as the District especially points out, should

a party causing a mistrial be allowed to take advantage of its conduct by using the extra time it created to add several million dollars to its damages claim.

Defendants' next argument that the District was somehow at fault because it did not ask specific enough questions at Duggan's deposition is without merit. The District's counsel articulated a standard dragnet question routinely asked by capable litigators and was told Duggan could think of no more damages. Duggan then waived reading and signing and, with it, his opportunity to add more damages via his deposition.

Defendants next argue that "precluding Mr. Duggan from testifying, as the representative of the owner of the property taken, is contrary to Kansas law." Despite this language, we understand from defendants' explanation that, as a landowner, Duggan should have been allowed to mention all of the excluded damages because they form his opinion of the value of his own land. See *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 802, 112 P.3d 125 (2005) ("there can be no doubt that a landowner's opinion of his or her property value is relevant in an eminent domain action").

This argument also fails. The district court properly excluded some damages because of defendants' failure to timely produce evidence in response to the District's motion for partial summary judgment. Others were properly excluded because of their untimely or inadequate disclosure. Parties cannot cure their past deficiencies simply because the landowner is qualified to opine on his or her land value. Nor, as defendants appear to argue, was the district court obligated to allow the "new" information into evidence and consider the additions as ammunition for the District to use for challenging the credibility of Duggan on cross-examination. See *City of Wichita v. Eisenring*, 269 Kan. 767, 773, 7 P.3d 1248 (2000) ("Considerable discretion is vested in the trial court in admitting or rejecting evidence of value.").

Finally, defendants argue that they should have been allowed to introduce testimony of the cost to extend Clear Creek Parkway. They point out that the District questioned its own expert witness, Shaner, at trial about whether he had considered access to the subdivision in his report. Defendants argue that the door had been

opened and Duggan therefore could testify about the cost of constructing Clear Creek Parkway. They were allowed to cross-examine Shaner to impeach his credibility but were prohibited from introducing specific damages associated with the cost of building such a road.

District courts have discretion to control cross-examination and introduction of evidence of value in eminent domain proceedings. *City of Wichita v. Eisenring,* 269 Kan. at 773 ("The latitude accorded to the parties in bringing out collateral and cumulative facts to support value estimates is left largely to the discretion of the trial court."); *State v. Corbett,* 281 Kan. 294, 307-08, 130 P.3d 1179 (2006) ("The trial court's decision to limit cross-examination is reviewed using an abuse of discretion standard."). The District's questioning Shaner about whether he had considered access in his valuation of the property then allowed defendants to impeach his credibility and report. However, that does not necessarily mean that the door was open for them to talk about anything related to road construction and claim it as part of the compensation owed for the condemned property.

Issue 3: *The district court refusal to instruct the jury that fair market value could not be determined by the summation of two different valuation approaches.*

The District brings a cross-appeal arguing that the district court erred in refusing to instruct the jury as it requested. The court gave the jury the pattern instruction, PIK Civ. 3d 131.05, which guides the jury in determining fair market value. The District requested a modified version of the instruction to clarify that defendants were not allowed to "stack" damages. The proposed instruction would have included the language: "As such fair market value is not to be determined by the summing of values indicated by different approaches."

After oral arguments to this court, the District filed a pleading announcing it would withdraw its cross-appeal in the event this court rejected the defendants' challenges. That motion is granted; accordingly, there is nothing to address.

We have reviewed other arguments of the defendants and conclude they have no merit.

Affirmed.